**Daniel WILSON, Plaintiff–Appellant,**

v.

**CHICAGO, MILWAUKEE, ST. PAUL, AND PACIFIC RAILROAD COMPANY, a corporation, Defendant–Appellee.**

No. 86–2042.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 22, 1987.

Decided March 8, 1988.

Rehearing and Rehearing En Banc Denied May 11, 1988.

---

Paul Bator, Meyer, Brown & Platt, Chicago, Ill., for plaintiff-appellant.

Daniel J. O'Connor, Baker & McKenzie, Chicago, Ill., for defendant-appellee.

Before EASTERBROOK and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

MANION, Circuit Judge.

Daniel Wilson, a railroad employee, sued his employer, the Chicago, Milwaukee, St. Paul and Pacific Railroad Company (the Railroad) under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.* (FELA). Wilson is paralyzed as the result of an accident which occurred during the workday when a fellow employee fell asleep while driving a car in which Wilson was a passenger. The district court granted the Railroad's motion for summary judgment on the ground that Wilson's injury did not occur while he was within the scope of his employment. But to grant the Railroad's motion, the district court had to resolve conflicting deposition testimony against Wilson. Therefore, summary judgment was improper, and we reverse and remand.

## I. NATURE OF THE CASE

Wilson, a Wisconsin resident, was the assistant foreman of a Railroad labor group that collected reusable rail from the tracks as part of a rail replacement project. The group was working along a track in Iowa stretching 23 miles from Moravia southwest through Mystic to Seymour. A schematic is as follows:

```
 + Moravia
 +
 +
 + Mystic
 +
 +
 + Seymour
```

Don Christian was the group's foreman. A week before the June 6, 1984 accident, Christian assigned Wilson to work with and supervise two others, Bernard (Bill) Barnes and Michael Craig, as an advance crew that drove along the track and marked rail for the remainder of the group, who rode in a work train with Christian, to pick up.

The Railroad did not provide transportation for the advance crew. Rather, the custom was for an advance crew member to use his own car to drive the crew to the work sites along the track. Pursuant to a collective bargaining agreement, the Railroad paid mileage to an employee to whom it did not furnish transportation and who used his own vehicle to drive between work points. This reimbursement also applied to transportation between the designated assembling point and the first work site.

Wilson testified in his deposition that, as an assistant foreman, he felt obligated to transport his crew in his van. Therefore, beginning with his assignment to the advance crew a week before the accident, Wilson drove the other two.

On Tuesday night, after driving along the tracks every day for a week, Wilson discovered problems with his van: "Those roads in Iowa had tore my front end up from all the ruts.... The A-frame had busted, the ball joint splattered." At that time, Wilson intended to work for one or two more days before leaving on a vacation. He therefore needed to repair his van.

On Wednesday morning, the entire group met before work for breakfast at a cafe in Moravia, the town located at the northernmost point of the twenty-three-mile stretch of track. The men discussed Wilson's van's poor condition. Wilson asked Christian if—before proceeding to his work site —he could drop off his van for repairs. Christian approved. The cafe's owner, overhearing the conversation, informed Wilson that a nearby garage could repair his van.

The group proceeded to a nearby work shack to receive their instructions for the day from Christian. Because of a shortage of clean 115–pound rail up the line, during that meeting Christian directed Wilson and his crew to go to Seymour, the southernmost town, to begin locating and marking that type of rail. This special assignment was in addition to their regular task of turning and marking all reusable rail. The crew was to begin in Seymour and work towards Mystic, where they were to work in the afternoon. Christian testified in his deposition that at the time he spoke to Wilson, "I didn't know exact footage [of clean 115–pound rail] what I needed." Christian did not explain in his deposition how or when he intended to inform Wilson of the amount.

According to Wilson's deposition, Christian told him that later in the day he would let him know how much rail was needed: "He said I'll let you know later on.... He didn't really know. He said he'd let me know later on." Christian denies telling Wilson to check back.

Wilson testified that the only ways to check back were to use a radio located at the station in Seymour or to find Christian, either in Moravia or else along the track.

"I would check in Moravia first. I wouldn't go crossing to crossing, only if they weren't in the hole I'd have to go look for them down the track." The "hole" apparently refers to the "siding" where the work train would wait while other trains came down the track. One siding was located right next to the depot in Moravia. Not surprisingly, the work train often spent a good part of the day in a siding.

After the meeting at the work shack, Wilson left his van at the garage located near the cafe in Moravia. That day Barnes would use his vehicle to transport the advance crew. Christian had asked Barnes to drive that day and Barnes, who was driving his daughter's car, had agreed reluctantly: "I didn't like it.... [I]t was her car, and I didn't want anything to happen to it.... [I] didn't want to ride over the rough roads with it." Craig had already refused to drive his car.

From the garage, Barnes drove Wilson and Craig southwest to the work site in Seymour. Through the morning, the crew located and marked the clean 115–pound rail as Christian had requested, in addition to marking old rail. For lunch, Barnes drove the crew northeast to Mystic, which was about halfway between Seymour and Moravia. Mystic also was their designated afternoon starting point.

After lunch, Wilson wanted to call the garage in Moravia "just to see how much the bill was going to cost me." However, he could not obtain the garage's telephone number through directory assistance.

Instead of remaining in Mystic to work, the crew traveled twelve miles northeast to Moravia, the northernmost town. Wilson claims a dual purpose for this detour to Moravia. He testified in his deposition that he told his subordinates, Barnes and Craig, that one reason why he wanted to go to Moravia was to find Christian to seek additional information about the amount of clean rail his crew needed to mark: "I said I got to check on my van. We got to also talk to Don [Christian] about this footage ... talk to Donny about this hundred fifteen pound rail."

Craig testified in his deposition that before departing, the only reason Wilson gave for driving to Moravia was to check on the van. Barnes does not recall whether Wilson said anything about looking for Christian.

Wilson testified that they looked for Christian in Moravia but did not find him. Barnes and Craig also testified that upon arriving in Moravia they looked for the group's work train in the siding but did not spot it there or see it on the tracks. But to reach the garage, the crew had to cross the tracks anyway. As Craig testified,

Just when we come into town, as you cross the tracks you can see the siding. Dan [Wilson] looked down there and said the train wasn't in right now.

. . . . .

I didn't know ... until after he said the train wasn't in that he had intended to look for it.

After that, the crew proceeded to the garage to check on the repairs to Wilson's van. Barnes testified in his deposition that his understanding at the time was that if the van had been ready, the crew would have switched to Wilson's van. The van was not ready, but the mechanic promised it would be ready by day's end.

The three headed back toward Mystic, where, according to Wilson, they intended to look again for Christian before resuming work nearby. On the road from Moravia to Mystic, Barnes fell asleep at the wheel. The ensuing crash rendered Wilson a quadriplegic.

The next day, Christian filed injury reports for Wilson, Craig and Barnes with the Railroad. In each report, he stated that the injuries occurred "on company time, going to center mark and turn rail." Christian later retracted this statement and testified that when he filled out these reports he did not know about the trip to Moravia to check on the van. But Christian signed a statement three weeks after the accident in which he stated that before drafting the accident reports, "[b]oth Barnes and Craig told me that they had eaten lunch in Mystic and the injuries oc-

curred after they checked on the van and were returning to Mystic...."

## II. NATURE OF THE PROCEEDINGS

Wilson commenced this action on December 30, 1983 by filing a complaint under FELA for an unrelated accident. On July 16, 1984, the district court granted Wilson leave to file an amended complaint, with Count I referring to the earlier accident and Count II to the June 6, 1984 accident.

45 U.S.C. § 51 provides that a railroad carrier engaging in interstate commerce is liable to "any person suffering injury while he is employed by such carrier in such commerce" for any injury "resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier...." This statutory language has uniformly been read as requiring a FELA claimant to prove that he was injured while in the scope of his employment. *See, e.g., Green v. River Terminal Ry. Co.*, 763 F.2d 805, 808 (6th Cir.1985) (collecting cases); *Fowler v. Seaboard Coastline R.R. Co.*, 638 F.2d 17, 19 (5th Cir.1981).

After extensive discovery, including depositions of Wilson, Christian, Barnes and Craig, the parties filed cross motions for summary judgment on Count II of Wilson's amended complaint. The Railroad contended that Wilson was outside the scope of his employment when injured because he went to Moravia only to check on his van in anticipation of his upcoming vacation trip. The Railroad primarily relied upon Christian's deposition testimony that he did not authorize Wilson's trip to Moravia: "They didn't have no business going to Moravia.... [T]hey had no business there, and I did not authorize them to go there at noon."

On May 21, 1986, the district court granted the Railroad's motion for summary judgment and denied Wilson's cross motion. *Wilson v. Chicago, M., St. P. & Pac. R.R. Co.*, No. 83 C 9653 (N.D.Ill. May 21, 1986) [available on WESTLAW, 1986 WL 6249].

Wilson subsequently moved for leave to file an amended complaint adding as Count III a common law *respondeat superior*

claim against the Railroad. The proposed amendment alleged that because Barnes drove to Moravia at his supervisor Wilson's direction, Barnes was within the scope of *his* employment when the accident occurred even if Wilson was not. On June 5, 1986, the district court denied Wilson's motion for leave to amend on the ground that the proposed Count III failed to state a claim upon which relief could be granted. The court reasoned that its entry of summary judgment for the Railroad on Count II controlled because both counts presented the same legal issue: whether any member of the crew was within the scope of his employment.

On June 20, 1986, pursuant to Fed.R. Civ.P. 54(b) and 58, the court entered final judgment both as to Count II and as to the denial for leave to file Count III. Wilson timely filed his notice of appeal.

### III. JURISDICTION

Federal jurisdiction was properly invoked pursuant to 28 U.S.C. § 1331 (federal question). Jurisdiction on appeal is proper pursuant to 28 U.S.C. § 1291 (final judgment on Count II and denial of leave to add Count III).

### IV. ANALYSIS

#### A.

■ "The Federal Employers' Liability Act does not use the terms 'employee' and 'employed' in any special sense...." *Baker v. Texas & Pac. Ry. Co.*, 359 U.S. 227, 228, 79 S.Ct. 664, 665, 3 L.Ed.2d 756 (1959) (per curiam). *Accord Kelley v. Southern Pac. Co.*, 419 U.S. 318, 95 S.Ct. 472, 476, 42 L.Ed.2d 498 (1974); *see Lancaster v. Norfolk & W. Ry. Co.*, 773 F.2d 807, 817–18 (7th Cir.1985), *cert. denied*, —— U.S. ——, 107 S.Ct. 1602, 94 L.Ed.2d 788 (1987). To define "scope of employment," a federal court should apply common law principles, as interpreted by other federal courts. *Chesapeake & Ohio Ry. Co. v. Kuhn*, 284 U.S. 44, 46, 52 S.Ct. 45, 46, 76 L.Ed. 157 (1931). *Accord Lukon v. Pennsylvania R. Co.*, 131 F.2d 327, 329 (3d Cir.1942). In applying common law principles to the

analogous agency question of when an employment relationship exists, the Supreme Court has often looked in particular to the Restatement (Second) of Agency (1957) (Restatement) as "a guideline for analysis and proper jury instructions." *Kelley, supra*, 95 S.Ct. at 476. See *Baker, supra*, 359 U.S. at 228, 79 S.Ct. at 665; *Ward v. Atlantic Coast Line R.R. Co.*, 362 U.S. 396, 400, 80 S.Ct. 789, 792, 4 L.Ed.2d 820 (1960) (per curiam).

■ The Restatement provides in pertinent part as follows:

§ 229. Kind of Conduct within Scope of Employment

(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.

This definition correctly sets forth what is a settled common law standard for defining scope of employment. See, e.g., *Croes v. United States*, 726 F.2d 31, 32 (1st Cir. 1984). See also Alan Sykes, *The Boundaries of Vicarious Liability: An Economic Analysis of the Scope of Employment Rule and Related Legal Doctrines*, 101 Harv.L.Rev. 563 (1988) (concluding that Restatement's test generally furthers economic welfare) (Sykes). The term "employed" defines the statutory class Congress intended to protect. Only if Wilson were within the Restatement's definition of scope of employment would he meet the statutory requirement of furthering interstate commerce, or "directly or closely and substantially" affecting it. 45 U.S.C. § 51. *Cf. Halderman v. Pennsylvania R. Co.*, 53 F.2d 365, 366 (2d Cir.1931).

#### B.

In general, to prevail upon a motion for summary judgment the moving party must demonstrate that there exists "no genuine issue as to any material fact," and that it "is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party opposing a summary judgment motion must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Anderson v. Liberty Lobby*,

*Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Wilson, however, argues that the quality of evidence necessary for a FELA claimant to defeat a summary judgment motion should be less than that.

Wilson acquires this notion from *Rogers v. Missouri Pac. R.R. Co.,* 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). There, to effectuate FELA's pure comparative negligence provisions, see 45 U.S.C. § 53, the Court set forth the following test for when the railroad's *negligence* must go to the jury:

> Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury ... for which damages are sought.

352 U.S. at 506, 77 S.Ct. at 448, *quoted with approval in Atchison, Topeka & Santa Fe Ry. Co. v. Buell,* —— U.S. ——, 107 S.Ct. 1410, 1414 n. 8, 94 L.Ed.2d 563 (1987).

■ The sentence that immediately follows the Court's reference to "even the slightest" shows what the Court meant by that reference:

> It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence.

352 U.S. at 506, 77 S.Ct. at 448 (footnote omitted). The footnote to that sentence set forth the text of 45 U.S.C. § 53, which provides that an employee's contributory negligence does not bar but rather reduces his damages proportionate to the amount of his contributory negligence. As a matter of substantive FELA law, an employer is liable for at least minimal damages even if the employee is almost totally contributorily negligent and the employer is only "even the slightest" negligent, so long as the employee proves that negligence by a preponderance of the evidence. Therefore, whether the employer was negligent is a triable issue for the jury where the evidence—read most favorably to the employee—shows that the employer is even slightly negligent. "Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury...." *Rogers,* 352 U.S. at 506–07, 77 S.Ct. at 448–49. (footnote omitted). The evidence required for a finding of negligence dictates a corresponding "slightest" hurdle for avoiding a directed verdict (or equivalent procedurally a summary judgment).[1]

■ But at issue here is not whether the Railroad was negligent or Wilson was contributorily negligent. Rather, the issue is whether Wilson was within the scope of his employment. We have found nothing in FELA's plain language or the policy behind it—and Wilson points to none—to indicate that Fed.R.Civ.P. 56 as traditionally applied does not govern evidence relating to "scope of employment." Even if negligence were not a factor and the employer responsible for every "work-related" injury, as in a workers' compensation scheme, see *Heater, supra,* 497 F.2d at 1246, Wilson would still have to show that there is a genuine issue of material fact regarding whether his injury was actually "work-related." In the typical state workers' compensation statute, recovery is limited only to those engaged in the scope of their employment. See W.P. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on The Law of Torts* § 80 at 575 (5th ed. 1984) (Prosser

---

1. We view the cases discussing when to take "negligence" from a jury as straightforward applications of the maxim that "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability...." *Anderson, supra,* 106 S.Ct. at 2513. *See Lancaster, supra,* 773 F.2d at 820 (7th Cir.1985); *Caillouette v. Baltimore & Ohio Chicago Terminal R.R. Co.,* 705 F.2d 243, 246 (7th Cir.1983); *Heater v. Chesapeake & Ohio Ry. Co.,* 497 F.2d 1243, 1246–47 (7th Cir.), *cert. denied,* 419 U.S. 1013, 95 S.Ct. 333, 42 L.Ed.2d 287 (1974). Compare *Moody v. Maine Cent. R.R. Co.,* 823 F.2d 693, 694–96 (1st Cir.1987) (expressly applying normal summary judgment standards found in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), in determining whether railroad's actions caused employee's injury).

& Keeton). While "negligence" has a special meaning within FELA's statutory scheme, "employee" and "employed" do not. *See* Prosser & Keeton at 578–79 (noting liberalization in FELA's negligence standard, but only where employee is in course of employment). Thus, FELA (or equivalently on liability Jones Act) cases deciding summary judgment on "scope of employment" issues apply the traditional summary judgment standards. 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 2729 at 198–99 (2d ed. 1983) (collecting cases). See *Fowler, supra,* 638 F.2d at 20; *Lirette v. N.L. Sperry Sun, Inc.,* 831 F.2d 554, 555 (5th Cir.1987) (per curiam).

That we should apply the usual summary judgment standards for scope of employment in this FELA action is confirmed by *Baker v. Texas & Pac. Ry. Co., supra,* 359 U.S. 227, 79 S.Ct. 664, 3 L.Ed.2d 756 (1959) (per curiam), a case presenting a factual issue other than the railroad's negligence. In *Baker,* the decedent was killed by a passing train while pumping sand and cement into the roadbed. The railroad introduced evidence showing that the decedent was not "employed" by it but rather by an independent contractor with a maintenance contract. The decedent's estate, however, introduced evidence showing that the railroad furnished the material he was pumping, that the work "was part of the maintenance task of the railroad," 359 U.S. at 228, 79 S.Ct. at 665, and that a railroad supervisor daily directed the details of his work. 359 U.S. at 228–29, 79 S.Ct. at 665–66. But the state trial judge would not submit the employment issue to the jury.

The Supreme Court reversed. The Court found that there was controverted evidence going either way about the employment question and concluded that

we think it perfectly plain that the question, like that of fault or of causation under the Act, contains factual elements such as to make it one for the jury under appropriate instructions as to the various relevant factors under the law.... Only if reasonable men could not reach differing conclusions on the issue may the question be taken from the jury.

359 U.S. at 228, 79 S.Ct. at 665. That is precisely the familiar summary judgment standard. *See Anderson, supra,* 106 S.Ct. at 2511. While having a jury determine factual questions is " 'part and parcel of the remedy afforded railroad workers' " under FELA, *Dice v. Akron, Canton & Youngstown R.R. Co.,* 342 U.S. 359, 363, 72 S.Ct. 312, 315, 96 L.Ed. 398 (1952) (quoting *Bailey v. Central Vermont Ry. Inc.,* 319 U.S. 350, 354, 63 S.Ct. 1062, 1064, 87 L.Ed. 1444 (1943)), there must be a genuine issue of material fact for the jury to determine.

### C.

 In reviewing whether there is a genuine issue about whether Wilson's conduct fell within the scope of his employment, we only need determine whether a reasonable jury could find for Wilson on this issue. Any "fact" we rely on is just the evidence read in the light most favorable to Wilson; we do not suggest that he will be able to establish such a "fact" at trial. We will not look at every conflict in the evidence nor at every factor which may be relevant in finding that Wilson either was or was not within the scope of his employment. We also will not comment on and in no way indicate how we would come out on the question were we the jury.

 Wilson claims that genuine issues of material fact continue to exist as to whether either looking for Christian or checking on the repairs to his van—or both—fell within the scope of his employment. Based on the evidence read in the light most favorable to Wilson, we agree that genuine factual issues remain.

Genuine issues exist as to whether Christian impliedly authorized Wilson's trip. As the district court stated, the advance crew "did not have Christian's explicit authority to travel to Moravia." But according to Wilson, Christian told him that later in the day he would let him know how much rail was needed. This on its face is not quite ordering Wilson to check back with Christian (as opposed to Christian contacting Wilson), but Wilson testified that this is

what he understood Christian meant when he said that. Wilson further testified that the only ways to check back were to use a radio located at the station in Seymour or to find Christian in the hole in Moravia or else along the track. If Wilson's testimony is true, then a jury could find that his conduct in traveling to Moravia to find Christian was implicitly authorized, despite Christian's contrary testimony.

█ The district court did not discuss whether Christian ordered Wilson to check with him, presumably because its finding that "plaintiff did not go to Moravia to find Christian" renders irrelevant any implied authorization. But Wilson testified that that was one reason for the trip. Wilson testified that he told his crew after lunch that checking with Christian to receive further instructions was a purpose in going to Moravia. Wilson's statements are contradicted by Craig and to a lesser extent by Barnes. The logistics also do not help Wilson, for he did not use the radio at Seymour before heading for lunch. Self-serving as it may be, Wilson's testimony is not inherently incredible, and sets up a conflict in the facts that a jury must sort out. *See Leonard v. Dixie Well Service & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir.1987); *see also Black v. Lane*, 824 F.2d 561, 562 (7th Cir.1987); *Hawkins v. Poole*, 779 F.2d 1267, 1269 (7th Cir.1985).

█ After discounting Wilson's purported purpose to locate Christian, the district court then found that while Wilson drove his van as a convenience to his fellow workers, the Railroad did not "require" him to drive. As a result, the court reasoned, anything Wilson did with his van could further only his personal interests. We disagree.

The district court erred in holding that as a matter of law an injury is compensable under FELA only if the railroad "required" the injured employee to perform the act from which the injury arose. Even if not required, an act could be within the scope of employment if it is "a necessary incident of his day's work." *Erie R.R. Co. v. Winfield*, 244 U.S. 170, 173, 37 S.Ct. 556, 557, 61 L.Ed. 1057 (1917). *Accord Caillouette*,

705 F.2d at 246. *See Mostyn v. Delaware, L. & W. R. Co.*, 160 F.2d 15, 17 (2d Cir.) (Learned Hand, J.) (eating and sleeping in bunk car, even when not on call, are "activities which, though literally not part of the work, are necessary to its performance."), *cert. denied*, 332 U.S. 770, 68 S.Ct. 82, 92 L.Ed. 355 (1947). When cases such as *Winfield, Caillouette, Mostyn* and *Atchison, T. & S.F. R. Co. v. Wottle*, 193 F.2d 628 (10th Cir.1952) use the word "necessary," it is in the sense of "appropriate;" they do not refer only to those acts which the employer requires. As *Atchison* stated, an act is not "necessarily incident to" or "an integral part of" employment when it is "undertaken by an employee for a private purpose and having no causal relationship with his employment." *Atchison*, 193 F.2d at 630. This test is equivalent to that set forth in § 229 of the Restatement.

Even if Wilson's trip was not authorized, or required, it could still have been within the scope of his employment. The Restatement at § 229 sets forth intelligent factors for a factfinder to consider in determining whether this has happened. We emphasize that no one factor is dispositive; establishing one or more factors is not equivalent to establishing scope of employment. We list those as to which the record reveals conflicting evidence:

(2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:

\* \* \* \* \* \*

(b) the time, place and purpose of the act;

(c) the previous relations between the master and the servant;

\* \* \* \* \* \*

(e) whether or not the act is outside the enterprise of the master ...;

(f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

\* \* \* \* \* \*

■ There are two principal factual issues here under the Restatement's factors: first, Wilson's motivation, and second, whether objectively his trip (before the crash) furthered the Railroad's business. For purposes of deciding this appeal, we only need to say that the jury should consider both.[2]

Wilson can argue to the jury that his motivation in driving to Moravia was at least in part to further the Railroad's business. While we suspect from the record · that Wilson's purpose was to check on his van to see whether it would be ready for his trip, he claims that he also wanted to check with Christian about the amount of clean rail to be marked. Even if Christian did not expressly authorize Wilson to check with him, Wilson could have believed that he did based on their conversation as set forth in their respective depositions. If so, Wilson's purpose might have been to further the Railroad's interest. The fact that the afternoon work site was near Mystic,

the middle point, is consistent with Wilson's testimony. Mystic, unlike Seymour, the southernmost point, had no track radio which could be used to call Christian. While Wilson did head back to Mystic without finding Christian and learning the information that supposedly required his trip, he dismisses this discrepancy by claiming that the advance crew also had its regular assignment to complete.

Wilson can also present to the jury his theory that his drive to Moravia objectively furthered—or at least fell within—the Railroad's business. The district court found as a matter of law that Wilson could not have reasonably believed the trip to Moravia was necessary or in the Railroad's interest. We hold that the district court should not have decided that on summary judgment. A jury could think it reasonable for an employee to check back with Christian, and reasonable to go to Moravia to speak in person rather than drive to Seymour to use the radio to do so.

■ Even if Wilson's only purpose was to check on repairs to the van, a jury could reasonably find that Wilson's trip to Mora-

2. There exists some tension where these two factors do not intersect. The Restatement at § 235 provides that "[a]n act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed." The Restatement's approach has been adopted by most FELA cases. "Under most definitions of 'course of employment' the plaintiff must show that the employee's tort was in attempted (though often misguided) furtherance of the employer's business. . . ." *Lancaster, supra,* 773 F.2d at 817 (collecting cases).

Other authority expands upon the Restatement's approach and does not always require a partial purpose to serve the master. See, e.g., *Ira S. Bushey & Sons, Inc. v. United States,* 398 F.2d 167, 170–72 (2d Cir.1968) (Friendly, J.); Fleming James, *Vicarious Liability,* 28 Tul.L. Rev. 161, 180–84 (1954). This latter approach would seem to fit well with FELA, where there is some indication that Congress intended to impose "enterprise liability." Congress, as told in the legislative history, wanted to force a railroad to bear the costs of the accidents it caused. Congress intended to shift the risk of accidents from employees, whom Congress determined are poor risk bearers, to the railroad, whom Congress determined would be a better risk bearer. See S.Rep. No. 460, 60th Cong. 1st Sess. 3 (1908); *Sinkler v. Missouri Pac. R.R. Co.,* 356

U.S. 326, 330–31, 78 S.Ct. 758, 762–63, 2 L.Ed.2d 799 (1958); see also *Baker v. Baltimore & Ohio R.R. Co.,* 502 F.2d 638, 641 (6th Cir.1974). In *Caillouette, supra,* this court found a switchman walking to work across a railroad yard was within the scope of his employment because he "was subject to dangers beyond those experienced by the commuting public." 705 F.2d at 246. Cf. *O'Keeffe v. Smith, Hinchman & Grylls Assocs. Inc.,* 380 U.S. 359, 362, 85 S.Ct. 1012, 1014, 13 L.Ed.2d 895 (1965) (per curiam) (under the Longshoremen's and Harbor Workers' Compensation Act, "'[a]ll that is required is that the "obligations or conditions" of employment create the "zone of special danger" out of which the injury arose.'" (quoting *O'Leary v. Brown-Pacific-Maxon, Inc.,* 340 U.S. 504, 507, 71 S.Ct. 470, 472, 95 L.Ed. 483 (1951))).

We do not see a conflict between these two approaches. To fulfill FELA's purpose, we need to ask the factfinder to determine if "(a) the tort arose during an errand of the sort that probably would not have occurred absent the existence of the employment relationship, or (b) for some other reason, the probability of the tort was substantially increased by the existence of the employment relationship. . . ." Sykes at 587. This is where the employee's purpose comes in. If the employee only had a personal purpose, it would be unusual for either one of these criteria to be satisfied.

via to check on and retrieve a van regularly used on railroad business benefited the Railroad. For example, Wilson testified that one purpose in caring for his van's repairs was to quickly return it to the Railroad's service. Both Wilson's and Barnes' depositions support the view that their goal was to substitute Wilson's van for Barnes' daughter's car if it had been ready. As an assistant foreman, and the advance crew's supervisor, Wilson could reasonably believe, and a jury could find, that his crew's morale would be strengthened by retrieving his van as soon as possible. In this regard, we note that if Wilson had intended to use his van for a long trip, it would have been in his interest to leave it in the garage until his departure. Christian's initial belief that the accident occurred "on company time" also could suggest to a jury that Wilson's belief that the trip to Moravia furthered the Railroad's business was reasonable. In addition, there is some evidence that repairing a disabled van could be considered part of the Railroad's enterprise. Had the Railroad transported the workers, it would have had a duty to transport them safely. The Railroad here instead paid mileage to Wilson and others and benefited from roadworthy vans.

■■■ Wilson goes further and asserts that as a matter of law his checking up on the status of his van's repairs was within the scope of his authority merely because he was initially authorized to drive a couple of blocks to drop off the van on work time (though it is not at all clear from Christian's deposition that he knew how close the garage was when he gave permission). We reject this claim. Dropping off the van was a special exception granted only after Wilson requested and received express permission from his supervisor. The very fact that Wilson asked for permission shows that he did not consider dropping off the van to be within his regular authorized employment. In addition, nothing in the record indicates that Wilson expected the Railroad to pay for those repairs, and in fact he ultimately paid for them. Thus we can not hold as a matter of law that the Railroad impliedly authorized a non-routine

act (checking on the status of the van's repairs) by expressly authorizing its employee to do a similar act (dropping the van off for repairs).

■■■ If Wilson were outside the scope of his employment in driving to Moravia, we do agree with the Railroad that there is no jury question in this case as to whether Wilson had re-entered his employment at the time of the accident. Wilson argues that even if he went on a detour he had already returned to his scope of employment. But as Restatement § 237 notes,

> A servant who has temporarily departed in space or time from the scope of employment does not re-enter it until he is again reasonably near the authorized space and time limits and is acting with the intention of serving his master's business.

The undisputed facts show that Barnes, Wilson and Craig merely retraced the precise route they followed in driving to Moravia, a route that they would not have been near had they gone to their afternoon work site. If they were not within the scope of their employment going out, they were not coming back. *Cf. Stephenson v. United States*, 771 F.2d 1105, 1107 (7th Cir.1985).

In sum, the Restatement states the question we are forced to focus on:

> The question whether or not the act done is so different from the act authorized that it is not within the scope of the employment is decided by the court if the answer is clearly indicated; otherwise, it is decided by the jury.

Restatement § 228, comment d. This means that summary judgment will not be granted in many cases, not because the procedural standard is less, but because the underlying substantive standard can only be resolved by weighing so many facts. *See Baker, supra,* 359 U.S. at 228, 79 S.Ct. at 665; *Lirette, supra,* 831 F.2d at 555. "A fact-bound approach calling for the balancing of incommensurables, an approach in which no ascertainable legal rule determines a unique outcome, is one in which the trier of fact plays the principal

**1358**

part." *Secretary v. Lauritzen*, 835 F.2d 1529, 1542 (7th Cir.1987) (Easterbrook, J., concurring). Here, whether Wilson was within the scope of his employment at the time of the accident is not clearly indicated. Therefore, the jury must decide the question.

### D.

Wilson also appeals the district court's denial of his motion for leave to amend. Wilson sought to add as Count III a common law *respondeat superior* claim against the Railroad. The proposed amendment alleged that Barnes, the driver, was within the scope of *his* employment when the accident occurred even if Wilson was not. The court held that proposed Count III failed to state a claim upon which relief could be granted. The court reasoned that its disposition of Count II controlled because both counts presented the same legal issues.

Jurisdiction in this action was based on federal question jurisdiction. Wilson notes in a footnote to his brief that the real party in interest is now the Soo Line Railroad, the successor to the bankrupt Railroad, and that this successor is now diverse with Wilson. Wilson apparently concedes that there is no diversity of citizenship between Wilson and the Railroad, although he alleges there is diversity with the successor. Under the doctrine of pendent jurisdiction, a claim where jurisdiction would not otherwise exist—i.e., a state law claim where there is no diversity—may be added on to a federal cause of action where a plaintiff "would ordinarily be expected to try them all in one judicial proceeding...." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). But pendent jurisdiction did not exist here after Count II was dismissed because Count I is unrelated.

Whether the Soo Line Railroad is a proper defendant depends on the nature of the right asserted and the substantive law, and should be passed upon by the district court first. Once the district judge dismissed Count II, he was correct in dismissing Count III. We do not express an opinion

on whether Count III states a claim upon which relief can be granted, or what defenses would then be available to the Railroad. Now that we have reinstated Count II, the district court will again need to exercise its discretion in determining whether to grant Wilson leave to amend.

REVERSED AND REMANDED WITH INSTRUCTIONS.