# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-3001

PAUL SOBIESKI and GAIL SOBIESKI,

*Plaintiffs-Appellants,*

v.

ISPAT ISLAND, INC., INDIANA HARBOR
STEAMSHIP CO., LLC, CENTRAL MARINE
LOGISTICS, INC., and M/V JOSEPH L. BLOCK,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for
the Northern District of Indiana, Hammond Division.
No. 2:01-CV-617-PRC—**Paul R. Cherry**, *Magistrate Judge.*

_____

ARGUED JANUARY 5, 2005—DECIDED JUNE 29, 2005

_____

Before KANNE, ROVNER, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* Plaintiffs Paul and Gail Sobieski twice filed suit in federal court, advancing various claims under the Jones Act and general maritime law relating to a peculiar incident that took place aboard the M/V *Joseph L. Block.* A grant of summary judgment and a stipulation of dismissal eliminated most of the Sobieskis' claims against most of the defendants in the two cases. The district court

then consolidated the two cases and later dismissed the remaining claims. The Sobieskis appeal the grant of summary judgment on their Jones Act claims. We affirm.

## I. Background

The circumstances giving rise to this suit, as alleged by Paul Sobieski, are decidedly odd. On the afternoon of April 4, 2001, the M/V *Joseph L. Block* was underway on its Lake Michigan route from South Chicago, Illinois, to Muskegon, Michigan. Sobieski,[1] a crewman assigned to the ship's engine department, completed a coal load on the ship's conveyor system and then headed to the recreation room to drink a cup of coffee. Sobieski eased back in a chair to relax and watch television for a bit. Unbeknownst to Sobieski, however, a figure silently crept up behind him as he watched the television. Suddenly, before Sobieski could react, the figure seized Sobieski's head between its hands.

The lurking figure was Sobieski's crewmate, Mike Barrett. And what Barrett did with Sobieski's head was bizarre, to say the least. As Sobieski alleged in his complaint and repeats in his opening brief, "Barrett snuck up behind his co-employee, Paul Sobieski, placed his hands on each side of Mr. Sobieski's head, and forcefully slammed it to the side against Mr. Sobieski's own right shoulder causing his neck to be injured." In short, Barrett cracked, or popped, Sobieski's neck—or, as Sobieski styles it, Barrett "tractioned [Sobieski's] neck, chiropractor style . . . ."

Sobieski claims that, as a result of this unrequested and unexpected neck "tractioning," he suffered intense pain— he immediately "fell onto one knee in front of his chair, with his eyes watering and a burning sensation in his neck."

---

[1] We will use "Sobieski" to denote Paul Sobieski, and "the Sobieskis" to denote the plaintiffs, Paul and Gail Sobieski.

After a few seconds in which to recover, Sobieski demanded to know why Barrett had done what he did. Barrett replied, "Look, I do it to myself all the time," and he proved it by "maneuvering" his own head in the same manner.

For days after this strange incident, Sobieski continued to suffer various after-effects of the neck-cracking—including numbness and tingling in his neck, left leg, arm, and side. Sobieski's physical problems worsened after he went ashore on April 15, 2001. For several months, Sobieski sought and received treatment for these ailments from several medical specialists. During the course of this treatment, Sobieski's employer, Central Marine Logistics, Inc. ("Central Marine"), paid one-hundred percent of his medical bills. It also paid Sobieski for 56 hours of work a week while the M/V *Joseph L. Block* was at sea, and paid him at the sickness and accident rate while the vessel was laid up.

On November 2001, however, matters took a turn for the worse. Sobieski experienced a "lock up pinch" in his neck and fell down his basement stairs. As a result, Sobieski broke his neck in three places and required multiple surgeries and rehabilitation. Central Marine stopped paying full medical coverage, so Sobieski had to rely on medical insurance to pick up coverage.

These events gave rise to a tangle of claims in federal court. In brief, the Sobieskis filed two separate complaints advancing various negligence claims under maritime law, including unseaworthiness, "maintenance and cure," and negligence under the Jones Act. Following a grant of summary judgment that disposed of most of the claims in the Sobieskis' first suit (including the Jones Act negligence claims), the parties stipulated to partial dismissal of most of the remaining claims. The two suits were then consolidated, and the district court dismissed all of the Sobieskis' remaining claims.

This appeal challenges the district court's grant of summary judgment on the Jones Act claims in favor of Sobieski's employer, Central Marine.

## II. Discussion

The district court granted summary judgment on the Sobieskis' Jones Act claims, so our review is *de novo. Scott v. Trump, Ind., Inc.*, 337 F.3d 939, 945 (7th Cir. 2003). Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Wilson v. Chi., Milwaukee, St. Paul & Pacific R.R.*, 841 F.2d 1347, 1354 (7th Cir. 1988) ("Jones Act[ ] cases deciding summary judgment on 'scope of employment' issues apply the traditional summary judgment standards.") (citations omitted).

We review briefly the Jones Act before proceeding to the merits. Prior to the enactment of the Jones Act, seamen were entitled only to "maintenance and cure" from their employer for injuries incurred "in the service of the ship" but not damages for the negligence of the ship's master or a fellow crewman. *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995) (citations omitted). Congress enacted the Jones Act to create a federal negligence claim for seamen injured in the course of employment. 46 U.S.C. app. § 688(a). The Jones Act provides this heightened legal protection to eligible seamen because of their exposure to "the perils of the sea" in the course of their duties. *Chandris*, 515 U.S. at 354. The act by its terms extends the protections of

the Federal Employer's Liability Act ("FELA")[2] to seamen, and thus FELA caselaw is broadly applicable in the Jones Act context. *See Greenwell v. Aztar Ind. Gaming Corp.*, 268 F.3d 486, 489 (7th Cir. 2001); *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 436 (4th Cir. 1999) ("[T]he Jones Act gives seamen rights that parallel those given to railway employees under the FELA.").

Thus, under the Jones Act, an eligible seaman (or a personal representative if the seaman is deceased) may file an in personam action in federal court against his employer for injuries suffered due to the employer's negligence. *See Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001); *Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 666 n.5 (7th Cir. 1998) (per curiam). In addition, under the doctrine of respondeat superior, a Jones Act employer may be liable for the negligence or intentional torts of its employees. *Greenwell*, 268 F.3d at 489; *Lancaster v. Norfolk & W. Ry.*, 773 F.2d 807, 818 (7th Cir. 1985); *Landry v. Oceanic*

---

[2]  FELA in relevant part provides that "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce" for "such injury or death resulting in whole or in part from the negligence" of the railroad carrier. 45 U.S.C. § 51. Among other things, FELA dispenses with several common law tort defenses—like the fellow-servant rule—that previously barred recovery by injured workers. *See Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542-43 (1994). Nevertheless, what constitutes negligence under FELA is determined by principles of common law. *See id.* at 543 ("[FELA] is founded on common-law concepts of negligence and injury, subject to such qualifications as Congress has imported into those terms[.]") (quotation marks and citation omitted); *see also id.* at 544 ("[A]lthough common-law principles are not necessarily dispositive of questions arising under FELA, unless they are expressly rejected in the text of the statute, they are entitled to great weight in our analysis.").

*Contractors, Inc.*, 731 F.2d 299, 303 (5th Cir. 1984); *Williamson v. W. Pacific Dredging Corp.*, 441 F.2d 65, 67 (9th Cir. 1971).

Turning to the merits, the Sobieskis advance two different Jones Act arguments. First, the plaintiffs contend that Central Marine is vicariously liable for what they describe as Barrett's "pseudo chiropractic ways."[3] Second, the plaintiffs argue that the defendant is directly negligent and liable for Sobieski's injury because it was aware (or should have been aware), through its officers, of Barrett's neck-tractioning activities and did nothing to prevent them. We take these arguments in turn.

### A. Respondeat Superior

As noted above, vicarious liability may extend to FELA or Jones Act employers under the traditional doctrine of respondeat superior. Well-established precedent applies the common law principle that an employer may be vicariously liable for its employee's negligence (or intentional tort) committed within the course or scope of employment—that is, committed while furthering the employer's (or the ship's) business. *See Greenwell*, 268 F.3d at 489; *Wilson*, 841 F.2d at 1352; *Lancaster*, 773 F.2d at 818; *cf. Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994).

The plaintiffs argue for a more expansive interpretation of Jones Act vicarious liability. The plaintiffs urge us to apply a standard that would abrogate the common law

---

[3] The plaintiffs characterize Barrett's actions as negligent. Barrett's "unauthorized touching," however, is more properly characterized as an intentional tort. But, as discussed below, the distinction is meaningless to the outcome of this case. *Cf. Lancaster*, 773 F.2d at 818 ("[FELA's] statutory reference to negligence is understood to embrace intentional misconduct.").

scope of employment rule in the Jones Act context. According to the plaintiffs, seamen should be entitled to broader legal protections under the Jones Act than railroad workers under FELA: all seamen serving aboard a seagoing vessel are by definition acting within the scope of employment, because the seamen "must remain on the vessel while off watch and at sea" and therefore are on the job "24/7." In fact, the plaintiffs' proposed rule would "extend liability to the [Jones Act] employer for all negligent acts by employees which occur on the vessel." Thus, the plaintiffs contend that there is no need to show that Barrett's acts were in furtherance of the ship's business.

We decline, however, to adopt the rule the plaintiffs propose. We may not ignore common law principles of negligence unless Congress expressly indicates otherwise. *See Gottshall*, 512 U.S. at 543-44; *see also* discussion *supra* in note 3. The express terms of neither FELA nor the Jones Act suggest the broad theory of vicarious liability proposed by the plaintiffs. In addition, we have noted that the "course of employment" test for FELA cases is identical to the standard to be applied in Jones Act cases. *See Lancaster*, 773 F.2d at 817 (collecting authority). Under that standard, a plaintiff must show that the employee's tort was committed in furtherance of the employer's business. *See id.*

The plaintiffs seek a rule that would in essence make Jones Act employers the absolute insurers of seamen they employ, regardless of the underlying theory of liability. Binding precedent makes clear, however, that neither FELA nor the Jones Act has such a broad sweep. *See Gottshall*, 512 U.S. at 543 ("FELA does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur.") (quotation marks and citation omitted); *Lancaster*, 773 F.2d at 817 (rejecting proposed rule that FELA employers should be liable "without regard to traditional limitations on respondeat superior"); *accord*

*Hernandez*, 187 F.3d at 436-37 ("[T]he Supreme Court has cautioned that the FELA, and derivatively the Jones Act, is not to be interpreted as a workers' compensation statute and that the unmodified negligence principles are to be applied as informed by the common law.").

The plaintiffs cite a number of cases in support of their proposed rule, but only two bear discussion. First, the plaintiffs offer *Wilson* for the proposition that this court has dispensed with the employer business interest requirement in favor of an "enterprise liability" theory purportedly favored by Congress. In *Wilson*, we applied § 229 of the Restatement (Second) of Agency to determine whether the tortfeasor's acts were within the "scope of employment." *See Wilson*, 841 F.2d at 1355-56. In a footnote, we noted that a number of courts had adopted the Restatement approach in FELA cases and also that there was "some indication" that Congress intended to impose "enterprise liability" in FELA cases. *Id.* at 1356 n.2. It is this dicta that the plaintiffs offer in support of the view that *Wilson* endorses their proposed broad theory of vicarious liability.

We did not, however, decide *Wilson* on the basis of commentary regarding enterprise liability. Indeed, we expressly indicated that, "[t]o define 'scope of employment,' a federal court should apply common law principles, as interpreted by other federal courts." *Id.* at 1352 (citations omitted). We merely recognized that the factors in § 229 were a useful guide in applying the common law, and we concluded that genuine issues of fact remained precluding summary judgment in that case. *See id.* at 1358. We did not, by application of § 229, endorse a rule abrogating the common law requirement that an employee's acts must be within the scope of employment before liability may be imputed to the employer. In fact, we expressly noted that "[i]f the employee only had a personal purpose, it would be unusual" that the acts would satisfy FELA's scope of employment requirement. *See id.* at 1356 n.2. The case entailed an unremark-

able application of § 229 and did not take the radical step of dispensing altogether with common law principles of respondeat superior—which, in any event, are not inconsistent with the factors enumerated in § 229. Thus, as the defendants observe, *Wilson* does considerably less than the plaintiffs claim.

The plaintiffs also cite *Baker v. Baltimore & Ohio Railroad. Co.*, 502 F.2d 638 (6th Cir. 1974). In *Baker*, the court declined to apply a scope of employment test at all, concluding that "[u]nder the FELA[,] a defendant's liability for the negligence of its servants is not restricted by the common law doctrine of respondeat superior." *Id.* at 641. The court also expressed its view that "[i]t is unnecessary to show that [employees] were negligent while performing a particular act 'in furtherance of their master's business,' as this common law term has been interpreted." *Id.* (citation omitted). Moreover, in a footnote, the court noted in dicta its view that FELA is a "liberal rule" and suggested that even if a scope of employment test might apply, it "might extend liability to the railroad for all negligent acts by employees which occur during the hours of the employee's working day on the employer's premises." *Id.* at 643 n.3. This dicta, of course, echoes the rule proposed by the plaintiffs.

We are unpersuaded, however, by the analysis and dicta in *Baker*. While it may be true that FELA (and, by implication, the Jones Act) was intended to be a "liberal rule," it is also true that we are not to ignore the statutes' clear terms or common law principles in the absence of statutory language indicating otherwise. *Cf. Gottshall*, 512 U.S. at 543-44. As we indicated in *Lancaster*, the *Baker* court read FELA's statutory language and liberal purpose too broadly in the respondeat superior context, and we decline to follow suit. *See Lancaster*, 773 F.2d at 817-18 ("[T]he purpose [of FELA] was not to broaden the doctrine of respondeat superior, least of all in intentional tort cases; it was to

eliminate the fellow-servant rule."). Although FELA dispenses with certain common law defenses, nothing in its express terms (or the terms of the Jones Act) indicates Congress's intent that we set aside common law principles of respondeat superior, and most courts have continued to apply traditional rules of respondeat superior for both negligence and intentional tort cases. *Cf. id.* (collecting authority and rejecting the *Baker* interpretation).

We shall do likewise here and apply the traditional scope of employment test. The plaintiffs must therefore show that Barrett acted in furtherance of the ship's business before Central Marine may be held vicariously liable for his actions, whether one characterizes the neck-tractioning as negligence or as an intentional tort. The plaintiffs have not done so, and we believe no reasonable jury could conclude otherwise.

As we have stated, "regardless of how individual courts have stated the tests, in order for an activity to qualify as being within the scope of employment, it must be a necessary incident of the day's work or be essential to the performance of the work." *Rogers v. Chi. & N.W. Trans. Co.*, 947 F.2d 837, 839 (7th Cir. 1991). By no stretch can it be said that Barrett's act of cracking Sobieski's neck satisfies the latter requirements. Barrett was a mate's assistant, and his official duties were to work on deck, steer the ship, and act as a lookout. It is undisputed that Barrett had no express authorization to crack anyone's neck, nor was such neck-tractioning part of his official duties.

The plaintiffs offer no evidence to the contrary, but instead argue that "[t]he focus of the inquiry, thus, is whether the negligent co-employee had a purpose, in part, to further the employer's interests." The plaintiffs point to Barrett's deposition testimony, in which he testified that he had cracked the necks of several crewmen over the years to help them feel better and, presumably, work better. The plain-

tiffs therefore contend that Barrett's subjective belief that he was helping Sobieski brings the neck-tractioning within the scope of employment because it was somehow beneficial to the operation of the ship.

We disagree. To the extent Barrett's subjective beliefs may be relevant to the scope of employment inquiry, those beliefs should be reasonable and the resulting action somehow related to the ship's business. In *Rogers*, for example, we held that a railroad employee who was injured while jogging off duty on company property was not acting in the scope of employment. We concluded that the plaintiff's subjective belief that jogging furthered his employer's business was not reasonable, and thus the act of jogging was not within the scope of his employment. *See Rogers*, 947 F.2d at 839 ("If plaintiff thought he was doing something which was necessary for or in the benefit of the railroad, this belief was not reasonable. Jogging benefits an employer in such an indirect and tangential way that plaintiff cannot be said to have been acting within the scope of employment."). We distinguished cases in which certain non-work-related activities, such as sleeping or eating, were found to be within the scope of employment because those activities were essential to acceptable work performance. *See id.* at 839 (collecting authority). In the absence of a company directive suggesting otherwise, we concluded that exercise was not a necessary incident to the plaintiff's job duties. *See id.* at 840.

As far as Barrett's subjective belief and his subsequent action, the same reasoning applies here. There simply is no evidence that the defendant knew of or condoned Barrett's "massages," no matter how well-intentioned they may have been. In addition, we fail to see how Barrett's off-duty neck-cracking was in any sense a necessary incident to the performance of his duties, regardless of what Barrett may have thought. Moreover, any conceivable benefit to Central Marine by the neck-cracking is even more tangential than

the jogging was to the employer in *Rogers*. Instead, Barrett's altruistic tractioning of necks clearly falls within that category of acts commonly held to be outside the scope of employment—those "undertaken by an employee for a private purpose and having no causal relationship with his employment." *Id.* at 839 (quoting *Wilson*, 841 F.2d at 1355); *see Lancaster*, 773 F.2d at 819-20 ("The usual view . . . is that when the motive for the employee's intentional tort is personal—which is to say unrelated to his employer's objectives and therefore not in furtherance of those objectives—the employer is not liable under a theory of respondeat superior.").

In sum, we conclude that no reasonable jury could find that Barrett's act of cracking Sobieski's neck falls within the scope of employment, and thus the plaintiffs' respondeat superior argument fails.

### B. Direct Liability

The plaintiffs next argue that the defendant is directly negligent for Barrett's act of cracking Sobieski's neck. Under the plaintiffs' theory, the defendant is liable because it knew, or should have known, that Barrett had a habit of cracking necks, but failed to prohibit or prevent Barrett from doing the same to Sobieski. We have recognized "direct negligence" claims of this variety as being independent of respondeat superior claims under FELA or the Jones Act. *See Lancaster*, 773 F.2d at 818; *see also Urie v. Thompson*, 337 U.S. 163, 178 (1949). Under this theory of liability, it is irrelevant whether the employee's act was in furtherance of the ship's business. *See Lancaster*, 773 F.2d at 818. Although the plaintiffs' argument under this theory is somewhat stronger than their respondeat superior argument, it fares no better.

The plaintiffs assert that the defendant is negligent because certain of the ship's officers knew of Barrett's proclivities yet did nothing to put a stop to them. Specifically,

in his deposition, Barrett answered "yes" when asked if any officers had seen him crack necks. In addition, Barrett testified to his belief that he had a "reputation" among "some" crewmen as a masseur or neck cracker. According to the plaintiffs, this "admission" showed that Barrett's acts were "common and continuous and that [he] had a reputation as a masseuse[sic] and neck cracker," such that the defendant was negligent for letting those acts continue.

As already noted, no evidence in the record indicates that the defendant actually knew of Barrett's activities, so the plaintiffs rely heavily on the notion that the defendant had constructive knowledge due to Barrett's purported reputation. The plaintiffs have not, however, presented evidence to support their assertion that Barrett had such a reputation that the defendant was, or should have been, on notice. In fact, the record discloses that Barrett's off-duty neck-cracking activities were anything but "common and continuous." Barrett testified that in twenty years of duty as a seaman, he had massaged or cracked the necks of only three people other than Sobieski: steward's assistant George Oram (three or four times in 1995 or 1996), steward's assistant Pam Juntilla (once in 1999), steward's assistant Shirley Bader (massage only, about three times, dates unknown), and Sobieski (the one time that led to this lawsuit). All of these instances (except Sobieski, the plaintiffs argue) were consensual transactions. As the defendant notes, in the five or six years preceding the Sobieski incident, Barrett had cracked only one person's neck—Juntilla's.

While Barrett's actions with these individuals may say much about his off-duty indulgences, they say nothing about whether Barrett had any sort of reputation of which the defendant should have been aware, such that the defendant should have taken steps to stop Barrett's "sneak attack" on Sobieski. No evidence in the record suggests the contrary. In fact, even Sobieski himself testified that he had

no knowledge of Barrett's activities, as did the ship's captain. The record simply does not support the plaintiffs' contention that Barrett frequently cracked necks and had a reputation for doing so.

As to Barrett's belief that officers had witnessed his activities, Barrett named none of these officers, and the plaintiffs have come forward with no evidence to substantiate this assertion (and we have found none in the record). Instead, the plaintiffs expend some effort arguing that one of the beneficiaries of Barrett's ministrations—assistant steward George Oram—was an officer, and thus Oram's failure to curtail Barrett's actions can impute liability to the defendant.[4]

There are several problems with this contention. The plaintiffs offer only their own definition of "assistant steward" to support the argument that Oram qualifies as an officer whose actions or lack thereof may be imputed to Central Marine. For example, the plaintiffs characterize Oram as a "part-time steward" and cite caselaw concluding that stewards are ship's officers. If anything, however, the evidence present in the record calls into serious question whether any reasonable juror could conclude that Oram is an officer, no matter how the plaintiffs seek to characterize Oram's duty title. In his deposition, Oram testified thus

---

[4] Bizarrely, evidence in the record indicates that sometime after the Sobieski incident, Oram himself tried his hand at massaging and cracking the neck of the ship's chief engineer, earning a reprimand from the captain in the process. The plaintiffs point to this incident as evidence of the defendant's knowledge of Barrett's activities, but we disagree. The timing indicates only that the ship's officers became aware of the dangers of neck-cracking after the Sobieski incident, which is hardly surprising. Likewise, the incident says nothing about whether the ship's officers knew or should have known of Barrett's predisposition to massage or crack necks at a point before he "maneuvered" Sobieski's head.

regarding his duties as assistant steward: "I assist the steward. [I] [t]ake all garbage, wash pots, scrub pots and pans, cut meat, peel vegetables, sweep and mop floors, put the groceries away, bag the dirty linen, [and] put it away when it comes back clean."

This duty description is as far from a supervisory, traditional ship's officer role as can be imagined. In fact, the closest Oram came to even approaching a level of responsibility on par with a ship's officer was his testimony that he was in charge of the galley in the steward's absence—but even then, he took orders from, and did work assigned by, the steward. Moreover, Oram never testified that he performed the actual duties of a steward, so the plaintiffs' efforts to bootstrap Oram up to the level of a de facto steward are unavailing. And even if Oram had occasional supervisory authority in the galley, no evidence indicates that his authority extended to Barrett, who worked on the deck. We have no difficulty concluding that no reasonable juror could find that Oram qualifies as an officer, given the limited scope of his responsibilities aboard the vessel.[5]

Because there is no evidence to suggest that Central Marine or its officers knew of (let alone, failed to stop) Barrett's hobby as an amateur chiropractor, no jury could find the defendant liable for the injury Sobieski suffered. The plaintiffs' direct negligence claim therefore fails.

In sum, for all of the reasons we have discussed, no reasonable juror could conclude that the defendant is liable under the Jones Act. Although we are cognizant of caselaw suggesting a lighter burden to be carried by Jones Act plaintiffs in surviving summary judgment, *e.g.*, *Leonard v.*

---

[5] Oram's fellow crewmen would probably agree with this conclusion. Even Sobieski in deposition described Oram as the "cook's assistant." Likewise, when asked if Oram was a ship's officer, Barrett responded, "No."

*Exxon Corp.*, 581 F.2d 522, 524 (5th Cir. 1978), the statute does not dictate that plaintiffs are entitled to skip the summary judgment stage altogether. *Cf. Wilson*, 841 F.2d at 1354. Even under a more relaxed standard of summary judgment, a Jones Act plaintiff must come forward with at least *some* issue of fact justifying the presentation of the case to the jury, or summary judgment would have no meaning whatsoever. It is clear that the plaintiffs have failed to do so in this case. The district court therefore properly granted summary judgment on the plaintiffs' Jones Act claims.

## III.  Conclusion

For the reasons given, we conclude that summary judgment on the plaintiffs' Jones Act claims is appropriate. We therefore AFFIRM the judgment of the district court.


A true Copy:

       Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*