**UNITED STATES of America (EPA) and Stop, Inc., Plaintiffs,**

v.

**ENVIRONMENTAL WASTE CONTROL, INC., et al., Defendants.**

**No. S87–55.**

United States District Court, N.D. Indiana, South Bend Division.

Oct. 26, 1988.

**1424**

Robert H. Oakley, F. Henry Habicht, U.S. Dept. of Justice, Environmental Enforcement Section, Anna Thode, U.S.E. P.A., Washington, D.C., Victor A. Franklin, U.S.E.P.A., Region V, Chicago, Ill., Andrew B. Baker, Jr., Asst. U.S. Atty., Hammond, Ind., for plaintiffs.

George W. Pendygraft, George Plews, Indianapolis, Ind., James H. Pankow, South Bend, Ind., for defendants.

## MEMORANDUM AND ORDER

MILLER, District Judge.

This cause is before the court on several motions for summary judgment and a motion to dismiss certain claims brought by the intervenors. The court concludes that, with respect to most of the summary judgment motions, issues of fact must be resolved at trial. The court cannot decide at this stage of the litigation whether defendant Steven Shambaugh is an "operator" of a hazardous waste site or whether defendant Environmental Waste Control, Inc. had sufficient insurance coverage or appropriate groundwater monitoring procedures when it filed its final permit application. Those issues must be decided at trial.

The court concludes, however, that Environmental Waste Control violated federal law by placing hazardous waste in unlined cells between May, 1985 and August, 1986. The court also concludes that the United States Environmental Protection Agency has jurisdiction to proceed with all counts of its complaint against these defendants and that this court may try this case without awaiting the results of proceedings before the Indiana Department of Environmental Management. Finally, the court concludes that the defendants may not ask this court to dismiss the portions of the intervenors' complaint that go beyond the claims brought by the United States Environmental Protection Agency.

### I. Introduction

This case centers about the Four County Landfill, a hazardous waste treatment storage and disposal facility located in the Northern District of Indiana. Environmental Waste Control, Inc. ("EWC") owns and operates the landfill. James Wilkins owns the land upon which the landfill is located and leases the property to EWC. Stephen Shambaugh is EWC's President and sole stockbroker.

### A. The EPA's Complaint

The United States Government, through the Environmental Protection Agency, brings this action for injunctive relief and civil penalties pursuant to Section 3008 [42 U.S.C. § 6928] of the Resource Conservation Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6991. Count 1 of the amended complaint alleges that EWC, Mr. Shambaugh and Mr. Wilkins have violated RCRA by operating a land disposal facility without a permit, due to their failure to comply with applicable financial responsibility and groundwater monitoring requirements under 320 IAC 4.1–22 and 4.1–20–2. Count 2 alleges that the defendants disposed of hazardous waste in unlined cells at its facility in violation of 42 U.S.C. § 6924($o$)(1)(A)(i)–(ii).

Count 3 of the EPA's amended complaint alleges that the defendants failed to imple-

ment a groundwater monitoring program capable of determining the landfill's impact on the quality of the groundwater in the uppermost aquifer. Count 4 alleges that the groundwater underlying the EWC facility is contaminated and the potential for contamination to nearby drinking wells requires corrective action in the form of an injunction requiring the defendants to clean up all contamination caused by the release from the EWC facility of hazardous wastes or hazardous waste constituents.

### B. The Intervenors' Complaint

On July 7, 1987, STOP moved to intervene in this action on the basis of 42 U.S.C. § 6972(b)(1)(B). On September 30, 1987, the EPA responded that § 6972(b)(1)(B) only authorized the filing of lawsuits where neither the federal nor state government had started litigation. The EPA stated that Congress, recognizing RCRA's failure to authorize citizen intervention in lawsuits brought by federal and state governments, enacted 42 U.S.C. § 9613(i) of the Superfund Amendments and Reauthorization Act to allow for such intervention if certain conditions are fulfilled. The EPA stated that it did not oppose STOP's intervention under that statute, provided that STOP did not introduce issues or claims extraneous to those presently before the court. STOP amended its motion to intervene, and the court granted STOP's motion to intervene on November 6, 1987.

STOP's complaint was deemed filed on November 13, 1987. STOP alleged and incorporated by reference the counts alleged by the EPA in its first amended complaint and added eleven claims.[1]

### C. The Pending Motions

Mr. Shambaugh seeks a determination that he cannot be held personally liable

under Section 3008 for any RCRA violations because he is not an "operator" as RCRA defines that term.

The EPA seeks partial summary judgment that (1) Mr. Shambaugh, Mr. Wilkins and EWC each are owners or operators of a hazardous waste disposal facility as RCRA defines those terms; (2) the defendants lost interim status to operate the Four County Landfill on November 8, 1985 and have operated the landfill illegally ever since; and (3) the defendants violated Section 3004(o)(1)(A)(i)–(ii) of RCRA [42 U.S.C. § 6924(o)(1)(A)(i)–(ii)] by disposing hazardous waste in cells lacking a double liner and a leachate collection system during the period of May 5, 1985 to August 19, 1986.

EWC, Mr. Shambaugh and Mr. Wilkins seek partial summary judgment on Counts 1 and 3 of the EPA's amended complaint because: (1) the doctrine of primary jurisdiction counsels this court's deference to proceedings of the Indiana Department of Environmental Management; and (2) the EPA has no jurisdiction to enforce its views on groundwater monitoring.

The summary judgment motions involve only the EPA and the defendants and do not address STOP's claims.

The defendants move to dismiss Counts 3 through 6, 8 through 12, 14, and 15 of the STOP's complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6).

Jurisdiction is vested in the court pursuant to 42 U.S.C. § 6928 and 28 U.S.C. §§ 1331, 1345 and 1355.

### II. The Resource Conservation and Recovery Act

The statutory and regulatory provisions of RCRA are described thoroughly and ar-

---

**1.** Count 3 alleges that the defendants set fire to and razed an abandoned house located on the Landfill. Count 4 alleges that the defendants failed to cover the cells in which hazardous wastes are placed. Count 5 alleges that in 1985 the defendants allowed multiple tanker trucks to discharge uncontainerized liquid waste. Count 6 alleges that the defendants have buried railroad tanker cars on the premises. Count 8 alleges that the defendants have mishandled containers holding hazardous waste, allowing

the containers to rupture and leak. Counts 9, 10, 11 and 12 allege that the defendants have inadequate run-on and run-off control systems. Count 14 alleges that the defendants failed to perform certain chemical and physical analyses. Count 15 alleges that the defendants lost their interim status to operate on November 8, 1985 and have continued to operate; STOP wants this operation enjoined. Count 7 is not challenged.

All claims alleged violations of the RCRA and its pertinent regulations.

ticulately in *Northside Sanitary Landfill, Inc. v. Thomas,* 804 F.2d 371, 373–375 (7th Cir.1986), and *United States v. Conservation Chemicals Co. of Illinois,* 660 F.Supp. 1236, 1237–1239 (N.D.Ind.1987). RCRA governs the disposal of solid and hazardous waste in the United States to prevent danger to human health and the environment. It mandates federal regulation of hazardous waste and strongly encourages solid waste planning by states. 42 U.S.C. § 6201. The Administrator was directed to promulgate regulations requiring each person owning or operating an existing hazardous waste disposal facility to have a permit. 42 U.S.C. § 6925(a).

### A. Part A Applications

The EPA could not issue permits to all hazardous waste applicants before RCRA became effective. Accordingly, Congress directed the Administrator to promulgate regulations allowing the owner or operator of a hazardous waste management facility that was in existence on November 19, 1980 to file a "Part A application" and continue hazardous waste disposal pending the final administrative action on the facility's application. 42 U.S.C. § 6925(e).

The Part A applicant must provide minimal information concerning the nature of its business, describe the hazardous waste management processes it employs, specify the types of hazardous wastes processed, stored or disposed of at the facility, and provide maps, drawings and photographs of the facility's past, present and future waste processing areas. 40 C.F.R. § 270.13. If the Administrator finds no reason to believe that the Part A application does not meet the disclosure requirements, an existing facility "shall have interim status and shall be treated as having been issued a permit" once it has filed a Part A application and given proper notice of hazardous waste activities. 42 U.S.C. § 6925(e); 40 C.F.R. § 270.70.

A facility that has been granted interim status is limited to the type of wastes and processing, storage and disposal procedures specified in the Part A application. A facility's interim status terminates either upon final administrative disposition of a permit application or upon the operator's failure to furnish the full information required by the Part B application. 40 C.F.R. § 270.73(a).

### B. Part B Applications

Under the 1984 amendments to RCRA, a facility that had been granted interim status before November 8, 1984 would have its interim status terminated on November 9, 1985 unless the facility (1) applied for a final determination regarding the issuance of a permit pursuant to 42 U.S.C. § 6925(c) (a "Part B" application) before November 9, 1985 and (2) certified its compliance with all applicable groundwater monitoring and financial responsibility requirements. 42 U.S.C. § 6925(e)(2).

The Part B applicant must provide detailed information including chemical and physical analyses of the hazardous waste treated at the facility and describe procedures for preventing contamination of water supplies; the Part B application process also involves a determination of the applicable seismic standard of the facility, a determination of whether the facility is located within a flood plain, and data relating to groundwater monitoring. 40 C.F.R. § 270.14. The applicant must furnish information concerning its use of hazardous waste containers, storage or disposal tanks, surface impoundments, waste pits, incinerators, land treatment facilities and landfills. 40 C.F.R. §§ 270.15–270.21.

Upon successful completion of both the Part A and Part B applications, an owner is issued a hazardous waste permit and must comply with the standards set forth in 40 C.F.R. §§ 264.1–264.351 ("Part 264").

### C. Lateral Expansion

Owners and operators of hazardous waste facilities must meet certain minimum technology standards. 42 U.S.C. § 6924. Owners or operators of existing landfills who conduct lateral expansion must install two or more liners and a leachate collection system above and between such liners, and meet certain standards concerning groundwater monitoring. 42 U.S.C.

§ 6924(*o*)(1)(A)(i)–(ii).[2] Owners and operators must notify the EPA of any lateral expansion at least sixty days before receiving any waste for placement in that expansion. 42 U.S.C. § 6936(b)(2).

## D. Role of State Environmental Agencies

A state environmental agency, as authorized by the Administrator pursuant to 42 U.S.C. § 6947(a), is responsible for the issuance of hazardous waste management permits. 42 U.S.C. § 6925(c). A state may apply to the Administrator for authority to develop and enforce a hazardous waste program "in lieu of" a federal program and federal enforcement. 42 U.S.C. § 6926.

40 C.F.R. §§ 271.1–271.137 sets forth the requirements for authorizing state programs and allows a state to obtain interim authorization in two phases. The first phase tracks the regulations of 40 C.F.R. §§ 265.1–265.430 and authorizes the state agency to, among other things, conduct closure proceedings for interim status facilities. *See* 40 C.F.R. § 271.28. State regulations and procedures displace the federal interim status regulations when a state obtains authorization for the first phase. The second phase authorization allows the state to issue permits under standards corresponding to those found in Part 270 and to enforce standards corresponding to those found at Part 264.

On August 18, 1982, the EPA granted Indiana Phase I authorization to promulgate interim status regulations. On January 31, 1986, Indiana received final authorization to promulgate interim status regulations.

Pursuant to Section 3005 of RCRA and the implementing regulations, owners and operators who have interim status to operate in Indiana under Section 3005(a) of RCRA must comply with the standards and requirements of Chapter 320 of the Indiana Administrative Code ("IAC"), Article 4.1–22, in operating facilities for the treatment, storage or disposal of hazardous waste. Pursuant to 320 IAC 4.1–22–24, owners and operators of hazardous waste facilities must meet certain financial responsibility requirements to establish financial assurance for liability to third parties.

Under 320 IAC 4.1–20–1, *et seq.*, owners and operators of hazardous waste facilities must meet certain groundwater monitoring requirements contained in the regulations. Under 320 IAC 4.1–21, *et seq.*, owners and operators of hazardous waste facilities must develop a written closure plan setting forth the steps necessary to close the facility in a manner that will minimize or eliminate post-closure escape of hazardous material and will minimize the amount of post-closure maintenance. Under both 40 C.F.R. § 265–112(c)(1) and (d)(3) and 320 IAC 4.1–21–3, the closure plan must be submitted to the EPA and the State of Indiana no later than fifteen days after termination of interim status.

## III. The EPA's Contentions

The parties agree that on August 18, 1980 the defendants notified the EPA that the Four County Landfill was treating, storing or disposing of hazardous wastes. On November 19, 1980, the defendants submitted their Part A application for a permit to treat, store, or dispose of hazardous waste at the landfill.

On November 7, 1985, the EPA received the defendants' submitted certification of compliance with the applicable financial responsibility and groundwater monitoring requirements. According to the EPA, the facility's insurance policy provided coverage below that required by RCRA, and the groundwater monitoring wells at the landfill were located in areas that were not at the limit of the waste area as required by regulations issued under RCRA. As located, the wells would not detect immediately any statistically significant amounts of haz-

---

**2.** 42 U.S.C. § 6924(*o*)(4)(B), concerning "minimum technological requirements", provides:

 (B) For the purposes of subparagraph (A)—
  (i) the term "approved leak detection system" means a system or technology which the Administrator determines incapable of detec-

tion leaks of hazardous constituents at the earliest practicable time; and
  (ii) the term "new units" means units on which construction commences after the date of promulgation of regulations under this paragraph.

ardous waste or hazardous waste constituents that migrate from the waste management area to the uppermost aquifer.

The EPA contends that because the defendants failed to comply with applicable financial responsibility requirements and groundwater requirements, the defendants' certification submitted under Part B was false; accordingly, the facility lost its interim status on November 8, 1985. The defendants have continued the storage and disposal of hazardous waste since November 8, 1985; the EPA contends that the defendants have done so unlawfully under Section 3005, 42 U.S.C. § 6925.

The EPA also alleges that before August 19, 1986 the defendants disposed of hazardous waste by the "cell" or "trench" method which violated RCRA because the hazardous waste was not disposed into cells with double liners and proper leachate collection systems. The EPA alleges that the defendants failed to notify the EPA of the lateral expansion of the landfill at least sixty days before receiving waste for placement in that expanded area in violation of 42 U.S.C. § 6936(b)(2).

The EPA seeks injunctive relief and civil penalties against the defendants as owners and operators of the landfill in amounts not to exceed $25,000.00 for each day of each violation of RCRA and applicable state regulations.

### IV. The Summary Judgment Motions
#### A. "Owner" and "Operator"

The EPA brings this enforcement action against EWC, Mr. Shambaugh and Mr. Wilkins for various alleged RCRA violations pursuant to 42 U.S.C. § 6928 as "owners and operators" of a hazardous waste facility. The EPA asserts that EWC, Mr. Shambaugh and Mr. Wilkins each are "persons" within the meaning of Section 6903(15)[3] and 40 C.F.R. § 260.10 and, therefore, are liable for the alleged RCRA violations.

The statutory and regulatory requirements of RCRA at issue in this case apply to "owners" and "operators" of facilities at which treatment, storage, or disposal of hazardous wastes occurs. 40 C.F.R. § 260.10 defines "owner" as "the person who owns a facility or part of a facility", and "operator" as "the person responsible for the overall operation of a facility". A determination that the defendants are owners or operators is a prerequisite to the defendants' liability under all of the claims for relief in the plaintiff's complaint.

Mr. Shambaugh and the EPA have filed summary judgment motions directed at the issue of whether Mr. Shambaugh is an "operator". The EPA also seeks summary judgment on the issue of whether Mr. Wilkins is an "owner" and whether EWC is an operator. Mr. Wilkins and EWC do not appear to dispute that they are owner and operator, respectively.

#### 1. Mr. Shambaugh's Contentions

Mr. Shambaugh contends that he is not an "operator" as that term is defined under RCRA and, therefore, cannot be held personally liable on any alleged RCRA violations. Mr. Wilkins owns the real estate upon which the landfill facility is situated; EWC owns the structures and improvements on the land that are used for treating, storing or disposing of hazardous waste. Mr. Shambaugh argues that EWC is the only "person" responsible for the landfill facility's overall operation. Mr. Shambaugh argues that he is but an officer of EWC, which is the operator for purposes of the relief that the EPA seeks. Only EWC sought and obtained a Part A permit to operate the Landfill; only EWC sought a Part B permit; only EWC can take any of the steps that a RCRA "operator" is authorized to take in operating the landfill.

Mr. Shambaugh maintains that no basis exists for disregarding EWC's corporate entity, piercing the corporate veil, and holding him personally liable as the landfill's "operator". Mr. Shambaugh argues that the statute contains no provision to find that more than one "operator" exists for this site. Mr. Shambaugh concedes that he

---

**3.** According to 42 U.S.C. § 6903(15), "person" is defined as "[a]n individual, trust, firm, joint stock company, corporation (including a government corporation), partnership, association, State, municipality, commission, political subdivision of a State, or any interstate body."

signed the certification for the Part A permit in the space entitled "operator", but claims he signed only as a representative of EWC.

### 2. The EPA's Contentions

The EPA argues that Mr. Shambaugh's own actions make him an "operator" for purposes of RCRA violations. The sole business of EWC is the landfill. The EPA asserts that Mr. Shambaugh testified in his deposition that EWC occupies 100% of his business activities, that he personally has operated equipment at the landfill, that he sometimes determined where to place waste at the site, and that he spends about half of each day at the landfill and the other half at EWC's business office. (Shambaugh Dep. Vol. I, pp. 19–21, 28–29). According to an EWC employee, Doyle Flory, Mr. Shambaugh has the final decision-making power with respect to the landfill's operation. (Flory Dep., p. 27).

The EPA characterizes Mr. Shambaugh as merely asserting that he is immune from liability because he is president of the corporation that allegedly is the "operator" for purposes of RCRA violations.

The EPA argues that Mr. Shambaugh's affidavit does not contradict his deposition testimony and merely makes conclusory assertions that he is not an operator, which are insufficient to create a material issue of fact for summary judgment purposes. The EPA points to Mr. Shambaugh's signatures on certificates (Part A and Part B) as operator of the landfill as evidence that he is an "operator".

### 3. Analysis and Resolution
#### a. Mr. Shambaugh

■ Mr. Shambaugh's summary judgment motion proceeds on the assumption that a hazardous waste treatment storage and disposal facility can have no more than one operator for purposes of a suit for injunctive relief and civil penalties pursuant to Section 3008 of RCRA, 42 U.S.C. § 6928(g). He has not, however, persuaded the court that the EPA may only seek such remedies against one owner and one operator. The court agrees that *Unit-*

*ed States v. Northeastern Pharmaceutical & Chemical Co., Inc.,* 810 F.2d 726 (8th Cir.1986), upon which the EPA relies, does not resolve the issue. *Northeastern Pharmaceutical* addressed a different provision of RCRA.

Nonetheless, it is difficult to believe that if three persons operated a hazardous waste facility as a joint venture on property owned by four other persons, only two of the persons (one as an owner, another as an operator) could be liable for civil penalties under Section 3008 of RCRA. Not every act will render a person an operator, but the court is unpersuaded that no more than one person may be an operator with respect to a given hazardous waste facility.

■ To hold that a hazardous waste facility may have two operators for RCRA purposes, however, is not to hold that Mr. Shambaugh is or was an operator of the Four County Landfill. The EPA argues that his activities have been such as to make him liable as an operator. Whether one (other than the entity that actually applied for interim status) is an operator is a fact-sensitive determination that requires greater development than the record before the court presents. *Compare United States v. Northeastern Pharmaceutical,* 810 F.2d 726; *United States v. Conservation Chemical Co.,* 660 F.Supp. 1236 (N.D. Ind.1987); *United States v. Conservation Chemical Co.,* 628 F.Supp. 391 (W.D.Mo., 1986); *State of Idaho v. Bunker Hill Co.,* 635 F.Supp. 665 (D.Idaho 1986).

Mr. Shambaugh opposes the EPA's motion for summary judgment on the issue of his status as an operator; the court must draw all reasonable inferences in favor of the party opposing summary judgment. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Davis v. City of Chicago,* 841 F.2d 186 (7th Cir. 1988); *Vachet v. Central Newspapers, Inc.,* 816 F.2d 313 (7th Cir.1987). Mr. Shambaugh's statements that he is not an operator neither preclude summary judgment for the EPA nor entitle Mr. Shambaugh to summary judgment. When seek-

ing or opposing summary judgment, a party cannot rest on mere allegations in the pleadings, *Boruski v. United States,* 803 F.2d 1421 (7th Cir.1986), or upon conclusory allegations in affidavits. *First Commodity Traders v. Heinold Commodities,* 766 F.2d 1007 (7th Cir.1985).

■ The record before the court leaves room for an inference that, while Mr. Shambaugh was active in the doings of the landfill, his activities were not so extensive as to make him an operator for purposes of RCRA. With respect to the EPA's summary judgment motion, Mr. Shambaugh is entitled to that inference at this stage of the litigation. Summary judgment generally is inappropriate when, as here, the parties disagree about inferences reasonably to be drawn from undisputed facts. *Bowyer v. United States Dept. of Air Force,* 804 F.2d 428 (7th Cir.1986).

Accordingly, because the court cannot agree that a hazardous waste facility can have but one operator, the court denies Mr. Shambaugh's summary judgment motion. Because genuine fact issues remain concerning the extent of Mr. Shambaugh's activities with the Four County Landfill, the court denies the EPA's motion for summary judgment on this issue. Whether Mr. Shambaugh is an operator for purposes of RCRA will be determined at trial.

#### b. Mr. Wilkins and EWC

The EPA also seeks summary judgment that EWC is an "operator" and Mr. Wilkins is an "owner" as those terms are defined under the statute. James Wilkins has presented no argument that he is not an "owner" as the term is defined in 40 C.F.R. § 260.10. He owns the land upon which the landfill is located and has leased that land to the EWC for use as a landfill. The EPA argues that "facility" is defined by the regulations to mean "all continuous land, and structures, other appurtenances, and improvements on the land, used for treating, storing, or disposing of hazardous waste". 40 C.F.R. § 260.10. Thus, the EPA asserts that Mr. Wilkins meets the definition of owner because he "owns a facility or part of a facility", in this case

the "land ... used for ... disposing of hazardous waste".

Review of the defendants' response to the EPA's motion discloses that this is not a disputed issue. A party opposing summary judgment must set forth some facts from which the court reasonably can infer that the party would be able to produce some evidence at trial to support its theory. *Matter of Morris Paint and Varnish Co.,* 773 F.2d 130 (7th Cir.1985). Mr. Wilkins and EWC have set forth no facts to suggest that they are not owner and operator.

Accordingly, the court finds, as a matter of law, that Mr. Wilkins is an "owner" and EWC an "operator" as those terms are defined under the statute.

#### B. Loss of Interim Status

■ According to the EPA, Congress became concerned that "interim status" facilities might be causing wide spread groundwater contamination and so imposed on the Hazardous and Solid Waste Amendments of 1984 ("HSWA") several new restrictions designed to minimize further land disposal of hazardous wastes and address problems at existing land disposal sites. Section 3005(e) of RCRA, a provision added by HSWA, provides that:

> In the case of each land disposal facility which has been granted interim status under this subsection before November 8, 1984, interim status shall terminate on the date twelve months after November 8, 1984, unless the owner or operator of such facility—
>
> (A) applies for a final determination regarding the issuance of a permit under subsection (c) of this section for such facility before the date twelve months after November 8, 1984; and
>
> (B) certifies that such facility is in compliance with all applicable groundwater monitoring and financial responsibility requirements.

42 U.S.C. § 6925(e)(2).

On November 7, 1985, the defendants submitted their certification of compliance with financial assurance and groundwater

monitoring provisions. The certification statement states that:

> The entire Four County Landfill facility ... is in compliance with: (1) all applicable ground-water monitoring and financial responsibility requirements in 40 C.F.R. Part 265 Subparts F and G; or (2) all applicable State ground-water monitoring and financial responsibility requirements which are part of the State's authorized hazardous waste program under section 3006 of RCRA.

### 1. The EPA's Arguments

The EPA contends that this certification was false, because the defendants were not in compliance with proper financial assurance and groundwater monitoring provisions.

#### a. Insurance Coverage

First, the financial responsibility regulations require insurance for both sudden and non-sudden occurrences. For sudden occurrences, the defendants should have obtained an insurance policy in the amount of $1,000,000.00 per occurrence with an annual aggregate of at least $2,000,000.00. 320 IAC 4.1–22–24(a); 40 C.F.R. § 265.147(a). For non-sudden accidental occurrences, coverage must be obtained in the amount of $3,000,000.00 per occurrence, with an annual aggregate of at least $6,000,000.00. 320 IAC 4.1–22–24(b); 40 C.F.R. § 265.147. If the amounts are added together, the total amount of insurance required is $4,000,000.00 per occurrence and $8,000,000.00 for both sudden and non-sudden occurrences.

According to the EPA, the defendants had insurance coverage for both sudden and non-sudden occurrences in the amount of $3,000,000.00 per occurrence and $6,000,000.00 aggregate limit, or $1,000,000.00 less per occurrence and $2,000,000.00 less per aggregate than required.

#### b. Groundwater Monitoring Wells

Second, the EPA asserts that the defendants did not place their downgradient wells in a location that would immediately detect any statistically significant amounts of hazardous waste or hazardous waste constituents that migrate from the waste management area to the upper most aquifer.[4] The affidavit of Joseph Boyle, the EPA's hydrogeologist, indicates that the landfill's downgradient wells were located 50 to 250 feet beyond the downgradient limit of the waste management area. (Boyle Aff., ¶ 25). The EPA has found contaminants in the groundwater around the landfill, evidencing the landfill is leaking. The EPA contends that no configuration of existing monitoring wells at the landfill satisfied the requirements of 320 IAC 4.1–20–2; 40 C.F.R. 265.91.

Because the defendants' Part B application certified compliance with these requirements when they were not in compliance, the EPA argues, the certification was invalid. This in turn means that the defendants lost their interim status to operate the landfill on November 8, 1985 and should have halted the operation immediately.

### 2. The Defendants' Arguments

The defendants argue that EWC satisfied RCRA's financial and groundwater monitoring provisions.

#### a. Insurance Coverage

First, EWC's insurance package conformed precisely to EPA's assessment of the required insurance. Endorsement No. 3, effective November 8, 1985, makes it clear that the $3,000,000.00 for each occurrence and $6,000,000.00 aggregate apply to all coverages under the policy for both sudden and non-sudden accidental occurrences. (Rutigliano Aff., ¶ 5). EWC asserts that its insurance broker, Nicholas Rutigliano, contacted the EPA hotline to confirm that the insurance coverage was within the limits set forth in the policy and

---

**4.** "Downgradient" here corresponds to "downstream" in a river, and means that the downgradient wells should be located to intercept immediately groundwater after it passes under or through waste. (Boyle Aff., ¶ 23).

was sufficient under RCRA and was told that the coverage was sufficient. (Rutigliano Aff., ¶ 4).

The defendants also argue that a subparagraph of Endorsement No. 3 provides that the limits of liability for each occurrence/annual aggregate shall be available in accordance with the applicable local, state or federal environmental financial responsibility obligations.

Mr. Rutigliano states that no claims were made under the policy and since June, 1986 the defendants have had an insurance policy providing $4,000,000.00 per occurrence and $8,000,000.00 aggregate. (*Id.* at ¶ 6).

### b. Groundwater Monitoring Wells

Second, EWC argues that experts consulted on the landfill's groundwater monitoring system have advised that the monitoring system was in full compliance with RCRA provisions. EWC argues that experts disagree as to where wells are to be placed to allow immediate detection of any statistically significant amounts of hazardous waste or hazardous waste constituents migrating from the waste management area to the uppermost aquifer. *See* 40 C.F.R. § 265.91. EWC asserts that the EPA came forward with no precise distance limits for well placement before September, 1986. Thus, EWC argues that it sought and followed expert guidance concerning placement of its monitoring wells and its own experts determined the monitoring system complied with federal and state regulations.

### 3. Analysis and Resolution

A party seeking summary judgment must demonstrate that no genuine issue of fact exists for trial and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Wilson v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,* 841 F.2d 1347 (7th Cir.1988); *Munson v. Friske,* 754 F.2d 683 (7th Cir.1985). If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. *Cel-*

*otex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Donald v. Polk County,* 836 F.2d 376 (7th Cir. 1988). A genuine factual issue exists only when there is sufficient evidence for a jury to return a verdict for the motion's opponent. *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656 (7th Cir.), *cert. denied* — U.S. —, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). Summary judgment should be granted if no reasonable jury could return a verdict for the motion's opponent. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Anderson v. University of Wisconsin,* 841 F.2d 737 (7th Cir.1988).

### a. Insurance Coverage

Genuine issues of material fact preclude summary judgment for the EPA with respect to the adequacy of EWC's insurance coverage. EWC submitted the affidavit of Nick Rutigliano, its insurance agent, who describes a confirmatory call to the EPA's "hot line" concerning the insurance contract's adequacy. The EPA responds with essentially two arguments. First, it suggests that the affidavit is insufficient because it fails to lay the proper foundation for admissibility of a telephone call. *See* Fed.R.Civ.P. 56(e). The court disagrees. Fed.R.Evid. 901(6)(B). Second, the EPA argues that the evidence is insufficient to support an estoppel against the EPA. The court is not prepared to so hold on the basis of the record now before the court.

The EPA argues that EWC's "good faith" is not a proper defense in a suit involving loss of interim status and cites two cases in support of its argument. In *Vineland Chemical Co. v. United States EPA,* 810 F.2d 402 (3rd Cir.1987), the court addressed its jurisdiction to hear Vineland's appeal from the loss of its interim status. Vineland had submitted its certification of compliance but had made no reference to financial assurances to cover closure and post-closure costs pursuant to 40 C.F.R. §§ 265.140–265.150. 810 F.2d at 404 n. 1. The EPA notified Vineland that its interim status was terminated. Vineland attempted to comply thereafter, but the EPA af-

firmed its decision. Vineland appealed the EPA's decision to terminate its interim status. The *Vineland* court found that it had jurisdiction and upheld the termination of interim status, but only on the basis of Vineland's failure to certify compliance with the financial responsibility requirements in a timely manner. 810 F.2d at 410 n. 5.

In *U.S. v. T & S Brass and Bronze Works, Inc.*, 681 F.Supp. 314 (D.S.C.1988), the court found after trial that T & S Brass could not certify that it had met the financial requirements because it did not have the non-sudden liability insurance required by 40 C.F.R. § 265.147. According to the *T & S Brass* court, a good faith effort to obtain the requisite insurance was not an available defense after November 8, 1985.

> Prior to November 8, 1985, EPA had allowed regulated facilities which were in compliance with every other aspect of RCRA, but were unable to obtain non-sudden liability insurance to certify compliance with the regulations if the facility had made "good faith efforts" to obtain insurance. However, this agency created "good faith" exception to the insurance requirement terminated on November 8, 1985.

*T & S Brass*, 681 F.Supp. at 321.

EWC did not fail to certify that it had insurance coverage. Instead, it is alleged that the amount it certified was inadequate. The *Vineland* court left that issue unresolved, 810 F.2d at 405 n. 2, and the *T & S Brass* court found, after trial, that T & S Brass had obtained no non-sudden accidental insurance coverage. 681 F.Supp. at 321. These cases do not entitle the EPA to judgment as a matter of law based on the record before the court.

#### b. *Groundwater Monitoring Wells*

Whether the groundwater monitoring wells at the Four County Landfill were placed appropriately is a material fact on which the parties disagree. EWC attempted to demonstrate the evidentiary dispute through the submission of exhibits attached to their response, including reports from their experts on the groundwater monitoring system at the landfill. Exhibits 9, 10, and 11 were not certified or authenticated for purposes of admissibility. However, the EPA did not object to these exhibits as inadmissible. Accordingly, the court has considered the reports, *see* A. Wright and C. Miller, *Federal Practice and Procedure* § 2722, at 60 (1983), and concludes that the factual dispute is genuine.

Accordingly, the court concludes that the EPA's motion for summary judgment on these issues must be denied.

#### C. *Violations of Minimum Technology*

█ Sections 3004(*o*) and 3015(b) of RCRA [42 U.S.C. §§ 6924(*o*) and 6936(b)] prohibit owners and operators of hazardous waste disposal facilities from placing hazardous waste in any new landfill or lateral expansion of an existing landfill after May 8, 1985, unless that new landfill or lateral expansion had the installation of "two or more liners and a leachate collection system above (in case of a landfill) and between such liners; and (ii) groundwater monitoring". 42 U.S.C. § 6924(*o*)(1)(A)(i)–(ii).

#### 1. *The EPA's Arguments*

The EPA argues that the defendants continued to place hazardous waste in unlined cells from May 8, 1985 until August 19, 1986, missing the statutory deadline by fifteen months. Because the defendants used the "cell" or "trench method", they constantly created new landfills or the lateral expansion of others.[5] The EPA submits an affidavit of Jonathan Adenuga, an EPA hydrogeologist and member of the Hazardous Waste Task Force inspecting the landfill, who states that, on June 10–11, 1986, he saw EWC employees excavate a cell from the ground, fill the cell with hazard-

---

**5.** According to the EPA and Mr. Wilkins' deposition testimony, the "cell method" entailed digging a 25' by 25' pit that was then filled and sealed. (Wilkins Dep., pp. 30–31). These pits were not excavated and prepared in advance, but rather were dug as needed. (*Id.* at 30–31). In the "trench method", a trench was dug and gradually extended as additional waste was deposited. (Wilkins Dep., p. 34).

ous waste, and then close the cell by placing a cover over it. (Adenuga Aff., ¶¶ 2–4). The cell did not have double liners or a leachate collection system. *Id.*

### 2. *The Defendant's Arguments*

EWC argues that there has been no impermissible lateral expansion at the landfill because: (1) the landfilling method EWC used until its double-lined, double-leachate collection system cell was completed in 1986 did not constitute a prohibited "lateral expansion"; (2) no substantial quantity of waste was actually placed in areas subject even to the EPA's definition of lateral expansion; and (3) even if lateral expansion had occurred, it halted months before this case was filed. EWC argues that the alleged conduct for which the EPA attempts to impose liability occurred years ago and is said to violate a provision that the statute does not define properly. EWC also claims that the waste deposited in those areas has been excavated and placed in cells meeting the EPA's minimum technological requirements.

### 3. *Analysis and Resolution*

Mr. Shambaugh testified in his deposition that waste would not have been deposited in lined cells before August, 1986. (Shambaugh Dep., p. 45). Jonathan Adenuga testified in his affidavit to seeing hazardous waste being dumped in an unlined cell on June 10–11, 1986. (Adenuga Aff., ¶¶ 2–4). The defendants have come forward with nothing to demonstrate the existence of a genuine factual dispute on this issue.

■ The defendants note that EWC's chief day-to-day operator, Doyle Flory, was uncertain whether any significant quantity of new waste actually was placed where no old waste was located. (Flory Dep., p. 24). The defendants suggest that this raises a factual issue as to whether EWC placed waste only in "exempt" cells that contained waste before May, 1985. While the court must draw all reasonable inferences in favor of the nonmoving party, Mr. Flory's deposition testimony provides nothing more than conjecture as to whether and when waste was dumped into cells. An opponent

of a summary judgment motion cannot simply show the existence of some metaphysical doubt as to material facts. *Matsushita Electrical Industrial Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The EPA asserts the legislative history of the HSWA amendments demonstrates that a landfill could continue to operate without a double liner and leachate collection system after May 8, 1985 only if newly disposed of waste was placed in a unit that already had waste in it. The defendants argue that the definition of "new unit" was not carried into the final act. When faced with a problem of statutory construction (here the definition of a "new unit" and lateral expansion), a court should show great deference to the interpretation given the statute by the officers or agency charged with its administration. *EPA v. National Crushed Stone Assoc*, 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980), *quoting Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). "An agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1984).

EWC's assertion that it no longer dumps in unlined cells and has transferred waste to proper containers does not render the case moot. *Dial v. Coler*, 791 F.2d 78, 81 (7th Cir.1986); *Watkins v. Blinzinger*, 789 F.2d 474, 483 (7th Cir.1986), *cert. denied* — U.S. ——, 107 S.Ct. 1976, 95 L.Ed.2d 816 (1987).

The defendants may be correct that the EPA seeks to "impose retroactive enforcement of its technical enforcement of an unclear statute to punish EWC for an alleged 'violation' that ended years ago", (EWC Memo. in Opp., p. 19), but this presents no bar to summary judgment on the issue. EWC has not demonstrated the materiality of the EPA's intent, and a party opposing summary judgment must show that the disputed fact is material, or outcome-determinative, under applicable law.

*Wainwright Bank & Trust Co. v. Railroadmen's Federal Sav. & Loan Ass'n,* 806 F.2d 146 (7th Cir.1986).

The court finds that the defendants violated the minimum technology requirements of RCRA by disposing hazardous waste into unlined cells from May 8, 1985 until August 19, 1986. 42 U.S.C. § 6924(*o*)(1)(A)(i)–(ii).

### D. Subject Matter Jurisdiction

Count 1 of the EPA's amended complaint alleges that the defendants have violated RCRA by continuing to operate a land disposal facility without a permit due to their failure to comply with applicable financial responsibility and groundwater monitoring requirements under 320 IAC 4.1–22 and 4.1–20–2. Count 3 alleges the defendants failed to implement a groundwater monitoring program capable of determining the landfill's impact on the quality of the groundwater in the uppermost aquifer.

### 1. The Defendants' Argument

The defendants assert that judgment should be entered in their favor on Counts 1 and 3 of the EPA's amended complaint because the EPA lacks jurisdiction to enforce its views on groundwater monitoring. According to the defendants, authority to resolve such issues has passed to the Indiana Department of Environmental Management ("IDEM") pursuant to RCRA's delegation provisions, 42 U.S.C. § 6901, *et seq.* Because Indiana is a fully authorized state under RCRA, its regulations and enforcement powers have preempted parallel federal RCRA regulations and have become the law to which the Four County Landfill is subject. The defendants argue that IDEM, the state agency, has acted with respect to enforcement of aspects of its hazardous waste management program such as groundwater monitoring and the EPA has no authority to

proceed to bring its own enforcement action.

The critical issue, according to the defendants, is not whether there has been certification of compliance with RCRA's financial assurance or groundwater monitoring requirements, but whether there was compliance with Indiana law. Compliance properly is a state law determination that the division of enforcement responsibility under RCRA leaves to the state and not the EPA.

### 2. The EPA's Argument

The EPA argues that the State of Indiana has never had the authority to enforce the loss of interim status violations as alleged in Count 1. 42 U.S.C. § 6925(e)(2). According to the EPA, Indiana and the EPA have entered into a cooperative "Memorandum Agreement" that provides in part, "While EPA retains responsibility for the direct implementation of those provisions of the HSWA which the state is not authorized to implement, it is the intention of the EPA and the state to coordinate the implementation of such provisions to the greatest degree possible." (Plaintiff's Exhibit 3, pp. 3–4).[6] On July 22, 1986, the IDEM requested that the EPA take enforcement action against the defendants for violation of interim status. (Plaintiff's Exhibit 1).

The EPA asserts that Section 3008(a) of RCRA specifically authorizes the EPA to commence civil enforcement actions in RCRA authorized states. 42 U.S.C. § 6928(a). Because Indiana has received authorization to carry out a hazardous waste program under 42 U.S.C. § 6926, the EPA need only give notice to Indiana before bringing suit for a violation of subchapter III of RCRA. The EPA gave such notice to Indiana on November 3, 1986. (Plaintiff's Exhibit 4). According to the EPA, every court confronting this issue has found that the EPA can maintain suits where an authorized state program is in

---

**6.** Although the EPA's Exhibit 3, Memorandum of Agreement, is unsigned, undated and not certified, the defendants have raised no objection to its consideration for summary judgment purposes. *See* 10A C. Wright and A. Miller, *Federal Practice and Procedure* § 2722, p. 60 (1983).

effect. *United States v. Rogers*, 685 F.Supp. 201 (D.Minn.1987); *United States v. T & S Brass and Bronze Works, Inc.*, 681 F.Supp. 314 (D.S.C.1988); *United States v. Conservation Chemical Co. of Ill.*, 660 F.Supp. 1236 (N.D.Ind.1987).

### 3. *Analysis and Resolution*

■ The defendants' argument is not novel. Other courts have held that the EPA has subject matter jurisdiction to file enforcement proceedings in a state authorized to carry out a hazardous waste program under 42 U.S.C. § 6926. Those cases persuade the court that the statute anticipated and resolves the issue as to whether the EPA has the authority to commence enforcement proceedings under 42 U.S.C. § 6928(a) in a RCRA-authorized state like Indiana. That conclusion is strengthened by the principle that courts should accord deference to an agency charged with a statute's enforcement unless the agency's interpretation is arbitrary, capricious, or manifestly contrary to the statute. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Lauer v. Bowen*, 818 F.2d 636 (7th Cir.1987); *United Fire Insurance Co. v. Commissioner of Internal Revenue*, 768 F.2d 164, 169 (7th Cir.1985).

The pertinent portions of § 6928 reads as follows:

**(a) Compliance orders**

(1) Except as provided in paragraph (2), whenever on the basis of any information the Administrator determines that any person is in violation of any requirement of this subchapter, the Administrator may issue an order requiring compliance immediately or within a specified time period or the Administrator may commence a civil action in the United States district court in the district in which the violation occurred for appropriate relief, including a temporary or permanent injunction.

(2) In the case of a violation of any requirement of this subchapter where such violation occurs in a state which is authorized to carry out a hazardous waste program under Section 6926 of this title, the Administrator shall give notice to the State in which such violation has occurred prior to issuing an order or commencing a civil action under this section.

\* \* \* \* \* \*

**(g) Civil Penalty**

Any person who violates any requirement of this subchapter shall be liable to the United States for a civil penalty in an amount not to exceed $25,000.00 for each violation. Each day of such violation shall, for purposes of this subsection, constitute a separate violation.

In *U.S. v. Conservation Chemical Co. of Ill.*, 660 F.Supp. 1236 (N.D.Ind.1987), another division of this court properly analyzed the concurrent jurisdiction intended by Congress in the enforcement of alleged RCRA violations by the EPA in RCRA authorized states. The EPA brought an action against Conservation Chemical for alleged RCRA violations pursuant to its enforcement powers under 42 U.S.C. § 6928(a). The EPA sought injunctive relief requiring Conservation Chemical to comply with the various requirements of RCRA and corresponding state statutes.

Conservation Chemical had been given interim status under its Part A application in 1980, but submitted none of the certifications required under the Part B certification. 42 U.S.C. § 6925(e)(2). Accordingly, Conservation Chemical lost its interim status and failed to submit proper closure and post-closure plans as required by 42 U.S.C. § 6925(e)(2) and 320 IAC 4.1–21–1 through 4.1–21–10.

Conservation Chemical argued, as do the defendants in this case, that the EPA had no enforcement authority to bring the action concerning closure plans because that enforcement authority was transferred to the IDEM. Conservation Chemical relied wholly upon *Northside Sanitary Landfill, Inc. v. Thomas*, 804 F.2d 371 (7th Cir.1986). The *Conservation Chemical* court found Conservation Chemical's reliance on *Northside* to be misplaced.

*Northside* addressed not the actual denial of a permit application, but rather Northside's standing to challenge the EPA's comments concerning the area in which Northside allegedly disposed of waste.[7] The *Northside* court determined that because Indiana was a RCRA authorized state pursuant to 42 U.S.C. § 6926 and thus could determine the closure requirements for any Indiana facility whose interim status had been terminated by the EPA, the EPA lacked statutory authority to commence an independent enforcement action so long as the state had exercised its judgment in a reasonable manner and within its statutory authority. 804 F.2d at 381–382.

The *Conservation Chemical* court distinguished *Northside* by stating that, "The *Northside* court was not concerned with an enforcement action, instead, it dealt with a party's standing and the EPA's authority under 42 U.S.C. § 6976(b). In this case, unlike *Northside,* the EPA is acting pursuant to its section 3008(a), 42 U.S.C. § 6928(a) enforcement authority."[8] 660 F.Supp. at 1244. The *Conservation Chemical* court found in § 6928(a) a clear expression of Congressional intent that the EPA retain independent enforcement authority even after a state received authorization to implement its own hazardous waste scheme: "When the EPA wishes to bring an action in a RCRA authorized state, all that is required of the EPA is that it must first notify that state of its intent." *Id.*

The court concurs with the analysis of *Conservation Chemical* and the other cases that have addressed this issue. *Wyckoff Co. v. EPA,* 796 F.2d 1197, 1200 (9th Cir.1986) ("Since the Administrator may exercise section 3008 powers even where a state program is in effect, it is clear that Congress did not intend, by authorizing a state program 'in lieu of the Federal program,' to preempt federal *regu-*

*lation* entirely."); *United States v. Rogers,* 685 F.Supp. 201, 203 (D.Minn.1987) ("The RCRA empowers the EPA to enforce violations of the act which occur in an authorized state such as Minnesota merely by notifying the state in conformance with the requirements of 42 U.S.C. § 6928(a)(2).").

EWC, Mr. Shambaugh and Mr. Wilkins attempt to distinguish *Conservation Chemical* on the ground that Indiana had informed Conservation Chemical that the state administrative actions to enforce the hazardous waste management program were "on hold" until the outcome of the EPA suit. In this case, the defendants argue, the IDEM is actively pursuing the pending state administrative proceedings. On September 30, 1987, IDEM issued a proposed intent to deny EWC's Part B permit application; that denial was made final on June 30, 1988. The EPA also denied the defendants' Part B permit application. The defendants are appealing the denial.

The EPA has submitted the Memorandum of Agreement between Indiana and the EPA, certain portions of which lend support to the EPA's argument that subject matter jurisdiction exists:

> Nothing in this Agreement shall be construed to restrict in any way EPA's authority to fulfill its program, oversight, and enforcement responsibilities under RCRA ...

> \* \* \* \* \* \*

> Nothing in this Agreement shall restrict EPA's right to inspect any hazardous waste generator, transporter, or facility or bring enforcement action against any person believed to be in violation of the State or Federal hazardous waste program ...

(Plaintiff's Exhibit 3, pp. 2, 25). The EPA also submits enforcement referrals from

---

**7.** Northside had disputed the area of the landfill where the Administrator had determined that hazardous wastes had been disposed. The Region V Administrator claimed hazardous waste was disposed of in an area that Northside claimed was only for the disposal of non-hazardous waste. Were the Administrator's comment allowed to stand, Northside's entire facility was subject to closure rather than only those

portions that contained hazardous waste. *Northside,* 804 F.2d at 381.

**8.** Section 6976(b) provides that "[r]eview of the Administrator's action ... in issuing, denying, modifying, or revoking any permit ... may be had by any interested person in the Circuit Court of Appeals of the United States ..."

David Lamm, Assistant Commissioner for Solid Waste Management, Indiana Department of Environmental Management, to the EPA, Region V, from July 26, 1986 and June 10, 1987, (Plaintiff's Exhibit 1), which relate to the landfill's groundwater monitoring violations and embody violations of minimum technology and financial assurance requirements.

42 U.S.C. § 6928(a), case law, and the EPA's evidentiary submissions compel the conclusion that the EPA has the authority to proceed with this enforcement action. Accordingly, the defendants' motion for summary judgment will be denied.

### E.  Primary Jurisdiction

#### 1.  The Defendants' Argument

■ The defendants argue that the court should defer action on Counts 1 and 3 of the EPA's amended complaint in deference to past and pending IDEM actions addressing the same matters raised in this action: the defendants' loss of interim status and assessment of the groundwater monitoring system employed at the landfill. The defendants argue that under the doctrine of primary jurisdiction the court should withhold any action on these counts in deference to IDEM's technical and extensive experience on the specific issues raised in these counts. The defendants are concerned that any court resolution of these issues may subject them to inconsistent determinations.

Undisputed matters reveal that for a number of years IDEM has sought to regulate and has initiated proceedings concerning the groundwater monitoring program at the landfill. In 1985, IDEM initiated a Notice of Violation Cause No. N–128, alleging violations of RCRA groundwater monitoring requirements at the landfill. That proceeding resulted in an agreed order, dated July 23, 1985. According to the defendants, EWC continually has submitted information to IDEM concerning the groundwater monitoring systems.

On September 30, 1987, IDEM issued a proposed intent to deny EWC's Part B permit application. That denial was made final on June 30, 1988. The EPA has also denied the Part B application. According to the defendants, IDEM based its denial on EWC's alleged violations of interim status groundwater monitoring and financial assurance requirements. EWC has appealed the EPA's and IDEM's denial of its Part B permit and has sought administrative hearings.

On October 11, 1985, IDEM initiated Cause No. N–209, which alleged violations of certain RCRA groundwater monitoring requirements and sought to clarify certain terms and requirements which were at issue in an earlier cause. Cause No. N–209 still pends, although the EPA asserts that IDEM issued no administrative complaint and that no formal administrative proceeding pends.

On July 28, 1988, IDEM notified the defendants that it approved EWC's most recent proposed groundwater monitoring plan. The defendants have continued to submit additional information and proposals to IDEM concerning EWC's groundwater monitoring system.

The defendants argue that this case's facts and current posture present the court with circumstances tailor-made for invoking the doctrine of primary jurisdiction. IDEM has greater experience in administering complex, technical environmental regulations, and IDEM has addressed and is now addressing in Cause Nos. N–128 and N–209 and the Part B permit proceedings the precise issues facing the court in Counts 1 and 3.

#### 2.  The EPA's Arguments

The EPA argues that only the EPA can enforce the loss of interim status alleged in Count 1, because Indiana does not and did not have authority to enforce the loss of interim status pursuant to 42 U.S.C. § 6925(e). If the court finds that the defendants lost their interim status on November 8, 1985 by falsifying their certification as to financial assurance and adequate groundwater monitoring systems, as alleged in Count 1, the only appropriate injunctive relief would be to close the landfill. The EPA also seeks civil penalties for this alleged violation.

Count 3 alleges the landfill is not in compliance with regulations governing groundwater monitoring requirements. The EPA seeks an injunction ordering compliance and also payment of civil penalties for past violations.

It is a measure of the parties' disagreement that they dispute even the scope of the proceedings before the IDEM. The EPA argues that the defendants' appeal of the denial of its Part B, RCRA permit application is the only proceeding before the IDEM involving groundwater monitoring. That proceeding will produce no findings whether the defendants were in violation of RCRA on November 8, 1985 or at particular times since then. However, the EPA announced its willingness to stipulate, to eliminate any possible inconsistent injunctive relief order, that if a violation is established the court should order the prompt implementation of the groundwater monitoring plan recently approved by IDEM.

### 3. *Analysis and Resolution*

▮ The doctrine of primary jurisdiction is concerned with promoting proper relationships between courts and administrative agencies, *Bradford Sch. Bus Transit v. Chicago Tr. Auth.*, 537 F.2d 943 (7th Cir.1976), *cert. denied* 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977), and arises in cases raising issues of fact outside the conventional experience of judges or requiring the exercise of administrative discretion. *Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952). Courts should not pass over agencies created by Congress if such a determination is made even though the facts serve as a premise for legal consequences to be defined in a judicial forum. *Id.* at 574–575, 72 S.Ct. at 494–495. "In such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *Bradford Sch. Bus Transit*, 537 F.2d at 949, *quoting Eisman v. Pan American World Airlines*, 336 F.Supp. 543, 547 (E.D.Pa. 1971). *See Parola v. Weinberger*, 848 F.2d 956 (9th Cir.1988).

▮ No fixed formula governs the doctrine; its applicability is determined on a case-by-case basis. *Bradford Sch. Bus Transit*, 537 F.2d at 949. The court should consider "(1) the desirable uniformity which would obtain if a specialized agency initially passed on certain types of administrative questions and (2) the expert and specialized knowledge of the agencies involved." *Id.* at 949, *quoting Eisman v. Pan American World Airlines*, 336 F.Supp. at 547.

The EPA states that Indiana, although a RCRA authorized state, is not empowered to enforce the loss of interim status violations alleged in Count 1. According to the EPA, and as discussed in *Northside Sanitary Landfill*, Indiana's final authorization under Phase II, granted on January 31, 1986, is subject to limitations imposed by the Hazardous Waste Amendments of 1984. The new requirements imposed by the 1984 amendments take effect in authorized states and the EPA is directed to carry out those requirements and prohibitions, including the issuance of full or partial federal permits, until the state is granted authorization to do so. *Northside*, 804 F.2d at 382, *quoting* 51 Fed.Reg. 3954 (January 21, 1986).

In an attempt to coordinate the provisions of the 1984 amendments, the EPA and Indiana entered into an agreement to coordinate the state's administration and enforcement of the state program and pending state authorization and the EPA's administration of the provisions of the Hazardous and Solid Waste Amendments of 1984. (Plaintiff's Exhibit 3, p. 1). On July 22, 1986, pursuant to this agreement, IDEM requested that the EPA take enforcement action against the defendants for violations of interim status.

When a court confronts a question concerning an agency's construction of a statute (here, whether Indiana is empowered to address violations of interim status), the court should defer to the agency's construction when that agency is charged with the statute's enforcement if the interpretation is reasonable and not in conflict with the expressed intent of Congress. *United*

*States v. Riverside, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). *Accord, Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

After reviewing *Northside,* the legislative intent of the 1984 amendments, RCRA, and the agreement between Indiana and the EPA, the court finds the EPA's assertion that Indiana has not received the authorization to enforce interim status violations to be reasonable. The administrative agency charged with the regulation of hazardous waste disposal initiated the suit seeking judicial relief. "Where the agency chooses to go to district court for enforcement, it makes little sense to refer the very question at issue back to the agency." *U.S. v. Conservation Chemical Company,* 661 F.Supp. 1416 (W.D.Mo.1987), *quoting C.A.B. v. Aeromatic Travel Corp.,* 489 F.2d 251, 254 (2nd Cir.1974). *See Merry v. Westinghouse Electric Corp.,* 697 F.Supp. 180 (M.D.Pa.1988). The EPA's proposed stipulation with respect to the relief under Count 3 avoids the risk of an inconsistent outcome concerning the groundwater monitoring system.

Accordingly, recognizing the need to promote the purposes of RCRA provisions at issue and the administrative expertise that can be brought to trial by the agency which is charged with RCRA's enforcement, the court concludes that the doctrine of primary jurisdiction should not be invoked to defer ruling on Counts 1 and 3 of the EPA's amended complaint.

### V. The Motion to Dismiss STOP's Additional Claims

#### A. Timeliness

■ The defendants did not file an answer to STOP's complaint until February 29, 1988; they filed this Rule 12(b)(6) motion on August 10, 1988. STOP contends that the motion is untimely. However, the defendants' answer included, as a ninth affirmative defense, that "STOP's Third through Fifteen Claims failed to state claims upon which relief can be granted because they violate the restriction against extraneous claims imposed by the court in

its Memorandum and Order granting intervention entered November 9, 1987."

STOP also argues that the defendants can properly present this issue only through a motion for summary judgment and the defendants failed to comply with District Rule 11, which requires a statement of material fact as to which the moving party contends no genuine issue exists, proposed conclusions of law, and a proposed summary judgment.

The defendants argue the Rule 12(b)(6) motion is timely. The defendants assert that they were engaged in extensive settlement negotiations that had the prospect of resolving all disputes and, therefore, did not want to burden the court with an unnecessary motion. The defendants argue that resolution of the issues presented does not require the court to go outside the pleadings.

Courts have allowed untimely motions if the defense was included in the answer. 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1361, p. 643 (1969). Although the motion to dismiss followed the filing of STOP's complaint by nearly nine months, the failure to state a claim was pleaded as an affirmative defense. When a party has included a special, specific defense in its answer, a subsequent motion to dismiss based upon those defenses should be allowed. *Zebrowski v. Denckla,* 630 F.Supp. 1307, 1308 n. 1 (E.D.N.Y.1986). Because resolution of this motion will not require the court to go outside the pleadings, there is no need to convert the defendants' motion to one for summary judgment.

#### B. Standing

■ The EPA's statement in response to STOP's intervention motion lies at the heart of the defendants' motion to dismiss. 42 U.S.C. § 9613(i) provided STOP's authority to intervene:

In any action commenced under this chapter or under the Solid Waste Disposal Act [42 U.S.C. § 6901, *et seq.*] in a court of the United States, any person may intervene as a matter of right when such person claims an interest relating to the subject of the action and is so situ-

ated that the disposition of the action may, as a practical matter, impair or impede the person's ability to protect that interest, unless the President or the State shows that the person's interest is adequately represented by existing parties.

In response to the intervention motion, the EPA stated, "The United States does not oppose STOP's intervention pursuant to 42 U.S.C. § 9613(i) provided that the intervenor does not introduce issues or claims extraneous to those presently before the court."

The defendants had objected to STOP's motion to intervene. When the court granted STOP leave to intervene, the court stated, "It appears from the statute that the only party authorized to respond to STOP's motion is the President or the State and therefore absent any opposition from the Government STOP will be granted leave to intervene." The court found that to consider the defendants' objections to STOP's motion to intervene would contravene the provisions of 42 U.S.C. § 9613(i). (Memo. and Order of November 6, 1987, p. 2).

The defendants premise their argument for dismissal on the limitation purportedly imposed by the EPA when it responded to STOP's motion. They contend that STOP has introduced claims and issues extraneous to those raised by the EPA. Such an argument, however, was not within the defendants' prerogative to raise in opposition to the intervention motion, and the filing of STOP's complaint imbues the defendants with no greater standing to raise the issue. If the EPA effectively conditioned STOP's intervention upon later events, it is the EPA, and the EPA alone, that can seek the benefit of those conditions.

The defendants have no standing to question the parameters of the intervenor's complaint. The defendants' standing has not changed from November, 1987 to now.

The court need not decide whether STOP intervened as a matter of right, whether its intervention was subject to a condition or whether Counts 3 through 6, 8 through 12, 14, and 15 are extraneous to those claims brought by the EPA. Only the EPA may seek rulings on those issues, and it has not done so.

Accordingly, the defendants' motion to dismiss STOP's allegedly extraneous claims must be denied.

## VI. Conclusion

Based on the foregoing, the court now finds that the motions for summary judgment should be GRANTED IN PART and DENIED IN PART.

1. The plaintiff's motions for summary judgment are GRANTED IN PART as follows:

(a) the court finds, pursuant to Fed.R. Civ.P. 56(d), that RCRA was violated by the disposal of hazardous waste in cells or trenches that lacked liners and leachate collection systems between May 5, 1985 and August 19, 1986; and

(b) the court finds, pursuant to Fed.R. Civ.P. 56(d), that EWC is an "operator" and James Wilkins is an "owner" for purposes of 42 U.S.C. § 6928.

2. The parties' motions for summary judgment are DENIED in all other respects.

3. The defendants' motion to dismiss Counts 3 through 6, 8 through 12, 14, and 15 of the intervenors' complaint is DENIED.

SO ORDERED.